WILLIAM LEVESQUE *v.* BRISTOL
HOSPITAL, INC., ET AL.
(SC 17666)

Rogers, C. J., and Katz, Palmer, Vertefeuille and Schaller, Js.

Argued September 4, 2007—officially released April 1, 2008

*Gary J. Strickland,* with whom, on the brief, was *Vincent M. DeAngelo,* for the appellant (plaintiff).

*Frank H. Santoro,* with whom, on the brief, was *Joyce A. Lagnese,* for the appellees (defendant Victoria W. Biondi et al.).

PALMER, J. The plaintiff, William Levesque, brought this action against the defendant Victoria W. Biondi,[1] an obstetrician-gynecologist, on behalf of his minor son, Daniel Levesque (Daniel),[2] to recover for injuries that Daniel had suffered as a result of the defendant's alleged negligence in connection with Daniel's delivery. A jury returned a verdict in favor of the defendant, and the trial court rendered judgment in accordance therewith. On appeal,[3] the plaintiff claims that the trial court improperly (1) declined to instruct the jury that the defendant is liable for injuries that Daniel had suffered as a result of a third party's negligence in performing an emergency medical procedure on Daniel following his delivery if the jury first found that the emergency procedure was necessary due to the defendant's negligence in delivering Daniel, (2) directed a verdict for the defendant on the issue of whether Daniel's mother had given informed consent to continue her efforts to undergo a vaginal delivery, rather than a delivery by cesarean section, after repeated attempts to induce labor had failed, and (3) awarded costs to the defendant for time that her expert witness had spent preparing for a deposi-

[1] The plaintiff also named as defendants Biondi's employer, Central Connecticut Obstetricians and Gynecologists, P.C. (CCOG), Eliza Holland and Miwako Ohta-Agresta, both of whom are nurse-midwives, John M. Walker, a radiologist, Walker's employer, Radiology Associates, P.C., Thomas G. Ward, a pediatrician, and the named defendant, Bristol Hospital, Inc. The plaintiff's claims on appeal, however, relate only to Biondi and CCOG. In the interest of simplicity, we refer to Biondi as the defendant. We refer to the named defendant as Bristol Hospital or the hospital throughout this opinion.

[2] William Levesque brought this action as Daniel's father and next friend. We note that it is unclear from the trial court record, including the pleadings, whether Daniel Levesque or William Levesque was the plaintiff. In the interest of simplicity, we refer to William Levesque as the plaintiff and Daniel Levesque as Daniel.

[3] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

tion noticed by the plaintiff. We reject the plaintiff's claims and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the evening of Friday, March 16, 2001, Karen Pilbin, Daniel's mother, was admitted to Bristol Hospital with elevated blood pressure. Pilbin was nearing the end of her pregnancy with Daniel, and the decision was made to induce labor. Although Pilbin had delivered her first child by cesarean section, she elected to attempt a vaginal birth with Daniel, a procedure known as a vaginal birth after cesarean section (VBAC), after being informed of its risks.

Throughout Friday night, Pilbin was administered Cervidil, a cervical ripening agent that induces labor. Physician's Desk Reference (62d Ed. 2008) p. 1167. By Saturday morning, when the defendant was on call, Pilbin had made no progress toward delivery. At that time, the defendant decided to begin administering Pitocin, another labor stimulant.[4] At about 8:30 p.m., when Pilbin still had made no further progress in her labor, the defendant advised Pilbin that she had several options. These included continuing to take Pitocin through the night, having a cesarean section that night or stopping all efforts until the morning and then resuming induction with Pitocin. According to the defendant, Pilbin indicated that she very much wanted to have a vaginal delivery, and, together, they decided that the best way to proceed would be to resume induction with Pitocin in the morning, when Pilbin would be well rested.[5]

---

[4] Pitocin is a synthetic version of oxytocin, a naturally occurring hormone that a woman's body produces in order to stimulate contractions. See S. Gabbe, J Niebyl & J. Simpson, Obstetrics: Normal and Problem Pregnancies (3d Ed. 1996) p. 382.

[5] Pilbin had a different recollection of the events that resulted in her decision to discontinue the use of Pitocin until the next morning. Pilbin testified that, although she could not recall who came into her room that evening to discuss her options, she did not recall anyone mentioning the

On Sunday morning, after a few hours on Pitocin, Pilbin began to experience stronger contractions. At approximately 11:45 a.m., the defendant inserted an intrauterine pressure catheter (catheter) into Pilbin's uterus to ascertain the strength of Pilbin's contractions. Daniel's heart rate dropped immediately after the catheter was inserted. The defendant was not alarmed, however, because Daniel appeared healthy, and his heart rate had varied since Friday night without ever reaching a critical point. At about 11:50 a.m., Pilbin was given an increased dosage of Pitocin, with the intended effect of increasing the strength of her contractions. At approximately 11:55 a.m., the defendant returned to her office in a building adjacent to the hospital but left instructions with the nurses caring for Pilbin to call in the event that any problems arose.

Soon after the defendant had left the hospital, nurse-midwife Eliza Holland became concerned with changes in Daniel's heart rate, and, at 12:05 p.m., Holland paged the defendant for a consultation. At about 12:12 p.m., Pilbin again was given a higher dosage of Pitocin,[6] but the administration of Pitocin was stopped completely at 12:20 p.m. when Daniel's heart rate again decreased.[7] At that time, Holland again had the defendant paged, and was informed that the defendant was on her way

option of undergoing a cesarean section that night. She further testified that, if she had been offered the opportunity to have a cesarean section at that time, she most likely would have agreed to pursue that option.

[6] Holland testified that she did not know who had increased Pilbin's dosage of Pitocin but that she would not have done so if she had been the one to make that decision.

[7] Holland testified that the administration of Pitocin can lead to less oxygen flow to the baby. She explained that "[i]ncreasing Pitocin can increase contraction strength and frequency. If you have a baby that is in any way experiencing decreased oxygenation, increasing the frequency of contractions increases the number—increases the frequency of periods [during which] the baby's exposed to the physiologic decrease in oxygen due to the uterus contracting." She testified that, ordinarily, Pitocin is not increased if there is concern that the baby is not getting enough oxygen.

back to the hospital. Pilbin then was prepared for an emergency cesarean section.

During this time period, the defendant had left her office to run an errand at a store about one mile from the hospital. As she entered the store, she received notice of Holland's page and returned immediately to the hospital to perform the cesarean section. When Daniel was born at 12:48 p.m., he was pale, blue, had no muscle tone, did not respond to stimulation and was not breathing. At that time, Daniel was transferred to a pediatric resuscitation team headed by pediatrician Thomas G. Ward.

Ward and his team intubated[8] Daniel at 12:53 p.m., five minutes after birth. An endotracheal tube was inserted through Daniel's mouth and a nasogastric tube was inserted through his nose. The endotracheal tube was to run through Daniel's trachea to provide oxygen and the nasogastric tube was to run into Daniel's stomach, where it would remove any air or liquid. When Daniel failed to improve, Ward ordered a chest X ray to ascertain whether the tubes had been positioned properly.

Radiological technician Linda Mackie took the X ray to radiologist John M. Walker, who read the film and informed Mackie that both tubes were positioned improperly. The endotracheal tube was in Daniel's esophagus, rather than in his trachea, and, therefore, the tube was not supplying air to his lungs. Walker could not tell from the X ray whether the nasogastric tube was in the trachea or in the esophagus, but he observed that it was positioned too high to perform its intended function. Mackie wrote down Walker's findings and returned to the nursery in which Daniel was being treated.

---

[8] Intubation is the "[i]nsertion of a tubular device into a canal, hollow organ or cavity . . . for [inter alia] control of pulmonary ventilation." Stedman's Medical Dictionary (28th Ed. 2006) p. 995.

Mackie testified that when she arrived at the nursery, she read aloud the results of Walker's findings to Ward. At trial, however, Ward testified that he did not recall whether Mackie had said anything to him about the X ray and, if so, what she had said. Ward examined the X ray himself, however, but apparently did not recognize that the endotracheal tube was not in the proper position to provide air to Daniel's lungs.

Shortly after examining the X ray, Walker proceeded to the nursery to check on Daniel's status. When Walker entered, Ward told Walker that he had moved the tube, and Ward made what Walker interpreted as a reassuring gesture, indicating with his hands that the tube had been moved upward in Daniel's body. Walker assumed that Ward was referring to the endotracheal tube because its improper positioning posed a much more serious problem than the improper placement of the nasogastric tube. Walker and Ward reviewed the chest X ray together, and Walker told Ward that the nasogastric tube also had to be moved. Walker then left the nursery, assuming that the problem had been resolved.

At approximately 1:40 p.m., a neonatal resuscitation team from the University of Connecticut Health Center arrived and reintubated Daniel,[9] at which point his heart rate and color improved immediately. Because of the improper placement of the endotracheal tube, however, Daniel suffered from insufficient oxygenation for more than fifty minutes, leaving him with severe brain injuries and cerebral palsy.

The plaintiff subsequently filed this action on Daniel's behalf, claiming, inter alia, that the defendant was negligent in the way that she managed Daniel's delivery. The plaintiff also claimed that the defendant improperly had

---

[9] In accordance with his general practice, Ward had contacted the resuscitation team of the University of Connecticut Health Center shortly after learning of Daniel's condition.

failed to obtain Pilbin's informed consent to continue to attempt a vaginal delivery of Daniel after prolonged efforts to induce labor had failed. Near the close of the plaintiff's case, the defendant filed a motion for a directed verdict on the plaintiff's informed consent claim, which the trial court granted.

At the close of evidence, the court instructed the jury on six subspecifications of negligence that the plaintiff had alleged against the defendant. In particular, the court instructed the jury on the plaintiff's claims that the defendant (1) attempted to deliver Daniel at Bristol Hospital when she knew or should have known that Bristol Hospital did not have medical personnel immediately available to provide emergency neonatal care, (2) failed to monitor Daniel properly and to respond to changes in Daniel's heart rate, (3) improperly administered Pitocin, (4) inadequately supervised the medical personnel involved in Daniel's delivery, (5) failed to perform a cesarean section in a timely fashion, and (6) was not present and available to perform the cesarean section immediately upon being informed that the procedure was necessary.

The jury returned a verdict in favor of the defendant.[10] In its answers to interrogatories, the jury indicated that it had found that, although the defendant had been negligent in her care or treatment of Pilbin or Daniel, that negligence was not a proximate cause of Daniel's injuries.[11]

---

[10] The jury also returned a verdict in favor of the defendants Central Connecticut Obstetrics and Gynecology, P.C., Holland, Walker and Radiology Associates, P.C. During trial, the plaintiff settled his claims against the defendants Ward and Bristol Hospital, Inc., for an undisclosed amount, and the action was withdrawn as against them. The plaintiff withdrew his claims against the defendant Miwako Ohta-Agresta before the commencement of trial.

[11] The jury answered two interrogatories with respect to the defendant. The first interrogatory provided: "Did the plaintiff prove by a preponderance of the evidence that the defendant . . . deviated from the standard of care in her treatment of . . . Pilbin or Daniel . . . ?" The jury answered "Yes."

The plaintiff filed a motion to set aside the verdict claiming, inter alia, that the trial court improperly (1) declined to instruct the jury that if the defendant was negligent in delivering Daniel, then that negligence was a proximate cause of the injuries that Daniel had sustained as a result of the initial, failed resuscitation procedure even though that procedure itself had been performed negligently, and (2) directed a verdict for the defendant on the plaintiff's claim that the defendant had failed to obtain Pilbin's consent to continue to attempt a vaginal delivery after initial attempts to induce labor had failed. The trial court denied the motion to set aside the verdict and, thereafter, awarded costs to the defendant for time that an expert defense witness had taken to prepare for his deposition by the plaintiff. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

We first address the plaintiff's claim that the trial court improperly declined to instruct the jury that the defendant was liable for any injuries that Daniel had suffered as a result of the failed resuscitation procedure if the jury first found that the procedure was necessitated by the defendant's negligence in delivering Daniel. Because the charge that the plaintiff requested is not a correct statement of the law, the trial court properly declined to give it.

The following additional facts and procedural history are necessary for our resolution of this claim. At trial, Ward acknowledged his mistake in failing to insert the endotracheal tube properly and in failing to remedy the problem in a timely manner. In addition, there appears

The second interrogatory provided: "Did the plaintiff prove by a preponderance of the evidence that the negligence of the defendant . . . was a proximate cause, a substantial factor in causing any of the injuries of Daniel . . . ?" The jury answered "No."

to be no dispute that, if that resuscitation procedure had been performed properly, Daniel would not have sustained any permanent injuries. Nevertheless, the plaintiff advanced the theory that, although Ward and his team had caused Daniel's injuries by inserting the endotracheal tube into Daniel's esophagus rather than through his trachea and by failing to rectify the problem in a timely manner, the defendant also was liable for those injuries because it was her negligence that had caused Daniel to require resuscitation in the first place. In support of this claim, the plaintiff maintained that the defendant's negligence in delivering Daniel had caused the need for remedial action, namely, the insertion of the tube through Daniel's trachea, and that the unskillful or negligent performance of Ward's resuscitation team, under our law, was a foreseeable consequence of the defendant's negligence. The defendant claimed that she was not negligent in delivering Daniel and that, even if she had been negligent, Daniel's injuries were attributable solely to the subsequent negligence of Ward's resuscitation team and not the defendant's negligence.[12]

---

[12] Until this court's decision in *Barry* v. *Quality Steel Products, Inc.*, 263 Conn. 424, 820 A.2d 258 (2003), the defendant would have characterized the resuscitation team's subsequent negligence as a superseding cause of Daniel's injuries. As we explained in *Barry*, a superseding cause may be described as "an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." (Internal quotation marks omitted.) Id., 434. "Thus, the doctrine of superseding cause serve[d] as a device by which one admittedly negligent party [could], by identifying another's superseding conduct, exonerate himself from liability by shifting the causation element entirely elsewhere. . . . If a third person's negligence [was] found to be the superseding cause of the plaintiff's injuries, that negligence, rather than the negligence of the party attempting to invoke the doctrine of superseding cause, [was] said to be the sole proximate cause of the injury." (Citation omitted; internal quotation marks omitted.) Id., 434–35. In *Barry*, however, we abandoned the doctrine of superseding cause in favor of a proximate cause analysis in most circumstances because, inter alia, "[t]he doctrine . . . no longer serve[d] a useful purpose in our tort jurisprudence, especially considering our system of comparative negligence and apportionment, [pursuant to which] defendants are responsible solely

The plaintiff filed a request to charge in accordance with this theory of liability. The requested charge provided in relevant part: "The plaintiff has alleged that [Daniel's] depressed condition at birth, requiring resuscitation, was caused by the [defendant's] negligence . . . in the management of labor and administration of Pitocin, including the failure to timely perform a [cesarean section]. Following this, the plaintiff alleged that other defendants were negligent in the course of the failed resuscitation. Under our law, a person who is injured is entitled to medical treatment, and if his injuries were the result of negligence, he may recover for any subsequent harm caused to him while receiving treatment for his original injuries. In other words, he may recover damages from the original wrongdoer for any worsening of his condition during the provision of subsequent medical treatment. This rule applies regardless of whether . . . anyone committed negligence during the course of subsequent treatment. As the rule applies to this case, if you find that [Daniel's] condition at birth, requiring his resuscitation, was the result of negligence on the part of [the defendant] . . . then [she] *would be responsible for all the consequences of the failed resuscitation, regardless of whether . . . you find that the failure to resuscitate was the result of negligence or some other cause.*

"Under our law, an injured party can recover from the original tortfeasor for damages caused by the negligence of a doctor in treating the injury which the tortfea-

for their proportionate share of the injury suffered by the plaintiff." Id., 446; see General Statutes §§ 52-572h and 52-102b (setting forth apportionment scheme applicable to negligence actions). Following *Barry*, therefore, the issue of whether the subsequent negligence of a third party breaks the causal connection between the tortfeasor's negligence and the harm suffered by the injured party is determined on the basis of traditional proximate cause analysis. Because the trial in the present case occurred after the issuance of our opinion in *Barry*, the doctrine of superseding cause played no role in the case.

sor caused, provided the injured party used reasonable care in selecting the doctor. . . .

"The injured person must use reasonable care in the selection of the doctor or hospital, but I instruct you that in this case this condition has been met, because due to the urgency of the situation of Daniel's birth, there was no other treatment choice available. *There-fore, if you find that pre-birth negligence placed Daniel in such a condition that he required resuscitation, then our law holds the initial wrongdoer or wrongdoers responsible for any further injuries resulting from the failed resuscitation.*" (Citations omitted; emphasis added; internal quotation marks omitted.)

The trial court declined to give the plaintiff's requested charge, explaining that the instruction that the court intended to give on proximate cause and apportionment adequately addressed the plaintiff's claim that the subsequent negligence of Ward's resuscitation team did not break the causal connection between the defendant's alleged negligence and Daniel's injuries. Specifically, the trial court stated: "I think it's clear to the jury from the . . . charge as a whole about apportionment and proximate cause that [the defendant]—if she's found negligent, that they're to determine what her relative share of the damages is." The court also noted that counsel for the plaintiff was free to elaborate, in closing argument, on the plaintiff's theory that the defendant's negligence was a proximate cause of Daniel's injuries and that the defendant, therefore, was liable for some or all of those injuries, notwithstanding the subsequent negligence of Ward's resuscitation team. The plaintiff's counsel nevertheless asserted that, at a minimum, a brief clarification by the court was necessary to assist the jury in understanding the plaintiff's claim that the defendant also was responsible for Daniel's injuries even though the negligence of Ward's resuscitation team was the direct cause of those injuries. The defen-

dant's counsel maintained that the plaintiff's requested charge was not an accurate statement of the law and, further, that the instruction that the court intended to give on proximate cause was sufficient. The court thereafter reaffirmed its decision not to instruct the jury in accordance with the plaintiff's request.

After the close of evidence, the trial court charged the jury on the issue of proximate cause as follows: "Now, what is this proximate cause concept about which you've heard a bit today? If you find that [the] defendant was negligent in at least one of the ways alleged in the complaint, the next question you must address is, was the negligence of [the] defendant a proximate cause of any of the injuries and damages or losses which [Daniel] has suffered? If your answer to that question is no, you must return a verdict for [the] defendant.

"In proving proximate cause, the plaintiff must show by a preponderance of the evidence, first, that [Daniel's] injury would not have occurred without the negligence of [the] defendant, that is, that the negligence was an actual cause—what we lawyers refer to as a cause in fact of the injury. The second thing the plaintiff must show is not only was the defendant's act or omission an actual cause of [Daniel's] injury, but it was also a proximate cause of [his] injury, that is, that it was a substantial factor in bringing about the injury. If an injury suffered by [Daniel] was a direct result or a reasonably probable consequence of the defendant's negligence, negligent act or omission, it was proximately caused by that act or omission."

The trial court also instructed the jury on the principle of apportionment. See General Statutes § 52-572h.[13] In

[13] The principle that each of two successive tortfeasors can share liability, provided that they both are determined to be a proximate cause of the injury, is embodied in our statutory scheme of proportional liability. General Statutes § 52-572h (c) provides in relevant part: "In a negligence action to recover damages resulting from personal injury . . . if the damages are

essence, the court informed the jury that it was "to decide what proportion, how much of the plaintiff's damages are the responsibility of each of the defendants found liable. . . . Each defendant is liable to the plaintiff only for that defendant's proportionate share of damages."[14]

On appeal, the plaintiff claims that the trial court improperly declined to give the instruction that he had requested. The plaintiff contends that the instruction was necessary because the theory of negligence pursuant to which one party can be held liable for the subsequent negligence of another is not likely to be readily apparent to a lay juror.

"The principal function of a jury charge is to assist the jury in applying the law correctly to the facts which [it] might find to be established . . . ." (Internal quotation marks omitted.) *State* v. *Lawrence*, 282 Conn. 141, 179, 920 A.2d 236 (2007). The purpose of a request to charge is to inform the trial court of a party's claim of the applicable principle of law. E.g., *Hall* v. *Burns*, 213 Conn. 446, 482, 569 A.2d 10 (1990). In determining whether a trial court improperly declined to instruct the jury in accordance with a party's request to charge, we "review the evidence presented at trial in the light most favorable to supporting the . . . proposed charge. . . . A request to charge which is relevant to the issues of [a] case and which is an accurate statement of the law must be given." (Internal quotation marks

determined to be proximately caused by the negligence of more than one party, each party against whom recovery is allowed shall be liable to the claimant only for such party's proportionate share of the recoverable economic damages and the recoverable noneconomic damages . . . ."

[14] The court further explained to the jury that the doctrine of proportional liability also was applicable to the apportionment defendants, Ward and Bristol Hospital, Inc., who, as we previously have noted; see footnote 10 of this opinion; settled with the plaintiff during trial. When the court refers to "each of the defendants" in its instruction, it is referring to Ward and Bristol Hospital, Inc., in addition to the defendant Biondi.

omitted.) *Brown* v. *Robishaw*, 282 Conn. 628, 633, 922 A.2d 1086 (2007). It follows from this principle, however, that "a request to charge must be an accurate statement of the law . . . ." (Internal quotation marks omitted.) Id., 636. Indeed, it is axiomatic that a trial court should not instruct the jury in accordance with a request to charge unless the proposed instruction is a correct statement of the governing legal principles. E.g., *State* v. *Colon*, 272 Conn. 106, 231, 864 A.2d 666 (2004) (because proposed instruction was not accurate statement of law, trial court properly declined to give it), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

It is true, of course, that a tortfeasor may be held liable for the subsequent negligence of a third party if that subsequent negligence was a foreseeable consequence of the tortfeasor's negligence. Thus, in the present case, the defendant could have been found liable for injuries that Daniel had suffered as a direct result of the failed efforts of the original resuscitation team, even though that team was negligent, if the plaintiff also could establish that the team's negligence in failing to correct the improper intubation in a timely manner was a foreseeable consequence of the defendant's negligence. See, e.g., *Wasfi* v. *Chaddha*, 218 Conn. 200, 214–15 and n.12, 588 A.2d 204 (1991) (tortfeasor may be liable for damages caused by negligence of physician in treating injury caused by tortfeasor, provided that injured party used reasonable care in selecting physician, if physician's subsequent negligence was reasonably foreseeable consequence of tortfeasor's negligence); *Anderson & McPadden, Inc.* v. *Tunucci*, 167 Conn. 584, 596, 356 A.2d 873 (1975) (same); *Lange* v. *Hoyt*, 114 Conn. 590, 598, 159 A. 575 (1932) (same); see also annot., 100 A.L.R.2d 808, 811 (1965) ("[t]he question whether a tortfeasor who causes personal injury is civilly liable to the person injured for the consequences

of negligence, mistake, or lack of skill on the part of the physician or surgeon who treats the original injury is basically a question of proximate cause").[15]

The request to charge that the plaintiff submitted, however, was defective because it contained language indicating that the jury was *required* to find the defendant liable for injuries that Daniel had suffered as a result of the resuscitation team's negligence if it first found that the tracheal intubation procedure had become necessary because of the defendant's negligence in delivering Daniel. In particular, the plaintiff requested that the jury be instructed that, "if you find that [Daniel's] condition at birth, requiring his resuscitation, was the result of negligence on the part of [the defendant] . . . then [she] *would be* responsible for all the consequences of the failed resuscitation . . . ." (Emphasis added.) The plaintiff's request further provided, "if you find that pre-birth negligence placed Daniel in such a condition that he required resuscitation, then our law *holds the initial wrongdoer or wrongdoers responsible* for any further injuries resulting from the failed resuscitation." (Emphasis added.) Contrary to the legal principle articulated in the plaintiff's requested charge, "[t]he question of proximate causation generally belongs to the trier of fact because causation is essentially a factual issue. . . . It becomes a conclusion of law only when the mind of a fair and reasonable [person] could reach only one conclusion; if there is room for a reasonable disagreement the question is one to be determined by the trier as a matter of fact." (Citations omitted; internal quotation marks omitted.) *Stewart* v. *Federated Dept. Stores, Inc.*, 234 Conn. 597, 611, 662 A.2d 753 (1995). The proposed charge was an inaccurate statement of the law because, in the present case, the jury was required to decide, as a matter of

---

[15] In the present case, the plaintiff's care in selecting a physician to perform the emergency medical procedure necessary for resuscitation is not an issue.

fact, whether the defendant's negligence was a proximate cause of the injuries that Daniel had suffered as a result of the resuscitation team's negligence.[16]

We agree with the plaintiff that the jury would have been aided by an instruction explaining that the defendant's liability did not automatically terminate as a result of the resuscitation team's negligence, and that whether the defendant should be held liable for the injuries that Daniel had sustained as a consequence of the failed resuscitation effort was a factual issue for the jury to decide, in light of all the relevant circumstances. Such an instruction undoubtedly would have been helpful because lay jurors may have difficulty applying a general instruction on proximate cause to a case, like the present one, involving a claim by the defendant that the subsequent negligence of a third party broke the causal connection between the defendant's negligent conduct and the harm suffered by the plaintiff, thereby constituting the sole proximate cause of that harm. The instruction that the plaintiff requested, however, was not a correct statement of the applicable legal principles and would have misled the jury to the detriment of the defendant. Accordingly, the trial court properly declined to give it.[17]

---

[16] We note that, in his reply brief to this court, the plaintiff acknowledges that, under our law, a fact finder may or may not find that the negligence of a subsequent tortfeasor is attributable to the original tortfeasor. As he states, there is no requirement that a jury "find a causative link between initial negligence and subsequent malpractice. . . . [Rather] a jury *may* find the negligence of an initial wrongdoer, in some percentage, to be a proximate cause of the plaintiff's injury." (Emphasis in original.) As we have explained, however, the request to charge that the plaintiff had submitted at trial was not an accurate statement of this principle.

[17] The plaintiff also challenges the trial court's jury charge on proximate cause, claiming, inter alia, that the instruction did not adequately address the concept of foreseeability for the purpose of apprising the jury of the relationship between the defendant's alleged negligence and the subsequent negligence of Ward's resuscitation team. The plaintiff did not raise this claim at trial, however, and he does not assert that the court's instruction on proximate cause constituted plain error. Moreover, the claim was not preserved by the plaintiff's inaccurate request to charge, which made no refer-

## II

We next consider the plaintiff's contention that the trial court improperly directed a verdict for the defendant on the plaintiff's claim of lack of informed consent. The plaintiff contends that he was entitled to a jury determination of his claim that the defendant had failed to obtain Pilbin's consent to continue attempting a vaginal birth after prolonged efforts to induce labor were unsuccessful. The defendant maintains that the trial court properly granted her motion for a directed verdict on the informed consent claim because the evidence adduced by the plaintiff was insufficient to inform the jury of the risks, benefits and hazards of continuing to attempt a vaginal birth under the circumstances of the present case. We agree with the defendant.

As we previously explained, Pilbin had undergone a cesarean section during the birth of her first child. Pilbin was hopeful, however, that she could deliver Daniel vaginally. Accordingly, on August 15, 2000, early in Pilbin's pregnancy, Carmelina Luongo, an obstetrician-gynecologist employed by the same medical group as the defendant,[18] informed Pilbin that there was a 1 percent chance of uterine rupture accompanying a VBAC procedure. Pilbin consented to the procedure and signed a consent form documenting that she had been advised of that risk but nevertheless had decided to attempt a vaginal delivery.[19]

At trial, the plaintiff presented the expert testimony of Myron W. Bethel, an obstetrician-gynecologist. Bethel

---

ence to foreseeability. We therefore decline to review the plaintiff's unpreserved claim. See, e.g., *Pestey* v. *Cushman*, 259 Conn. 345, 373, 788 A.2d 496 (2002) (appellate court will not review merits of unpreserved claim of instructional impropriety in absence of claim of plain error).

[18] At all times relevant to this appeal, both the defendant and Luongo were employed by the defendant Central Connecticut Obstetricians and Gynecologists, P.C.

[19] There is no dispute that Pilbin gave informed consent to a VBAC at that time.

testified that, after reviewing Pilbin's medical records, he considered her pregnancy to be high risk because she previously had undergone a cesarean section, she was of advanced maternal age and, just prior to being admitted to the hospital, she had developed symptoms of pregnancy-induced hypertension. Bethel further testified that, by Saturday evening, March 17, Pilbin's chances for a successful vaginal delivery had decreased, and it was clear that, despite many hours on Pitocin, Pilbin still was "remote from delivery." In Bethel's view, because Pilbin previously had undergone a cesarean section due to cephalopelvic disproportion,[20] and because, all factors considered, she had a high-risk pregnancy, Pilbin should have been advised to have a cesarean section on Saturday evening. Bethel also testified that if Pilbin nevertheless had refused to have a cesarean section, Bethel would have considered that decision to be against medical advice. Pilbin testified that if she had been informed on Saturday evening that her chances of having a successful vaginal delivery had decreased, she most likely would have agreed to a cesarean section at that time.

Near the conclusion of the plaintiff's case, the defendant filed a motion for a directed verdict on, inter alia, the plaintiff's informed consent claim. The trial court granted the motion as to that claim, concluding that Bethel's testimony was insufficient to guide the jury in determining whether, as of Saturday evening, the defendant again should have obtained Pilbin's informed

---

[20] Cephalopelvic disproportion is a condition whereby the head of the baby and the pelvis of the mother are disproportionate. See J. Williams, Obstetrics (19th Ed. 1993) p. 483. Bethel testified that patients who have had a previous cesarean section because of a cephalopelvic disproportion are more likely to fail in any subsequent attempt to deliver vaginally as compared to those who previously have had a cesarean section due to "a nonrecurring cause." He also testified that, in 2001, the recognized chances of a successful VBAC when the mother's prior cesarean section had been due to cephalopelvic disproportion were between 50 and 70 percent.

consent to a VBAC in light of the changed circumstances.

We begin our analysis of the plaintiff's claim with the legal principles governing our review. "The standards for appellate review of a directed verdict are well settled. Directed verdicts are not favored. . . . A trial court should direct a verdict only when a jury could not reasonably and legally have reached any other conclusion. . . . In reviewing the trial court's decision to direct a verdict in favor of a defendant we must consider the evidence in the light most favorable to the plaintiff. . . . Although it is the jury's right to draw logical deductions and make reasonable inferences from the facts proven . . . it may not resort to mere conjecture and speculation. . . . A directed verdict is justified if . . . the evidence is so weak that it would be proper for the court to set aside a verdict rendered for the other party." (Internal quotation marks omitted.) *Riccio* v. *Harbour Village Condominium Assn., Inc.*, 281 Conn. 160, 163, 914 A.2d 529 (2007).

"[U]nlike the traditional action of negligence, a claim for lack of informed consent focuses not on the level of skill exercised in the performance of the procedure itself but on the adequacy of the explanation given by the physician in obtaining the patient's consent. . . . Traditionally, a physician's duty to disclose information was measured by a professional standard which was set by the medical profession in terms of customary medical practice in the community. . . . [However, in] *Logan* v. *Greenwich Hospital Assn.*, [191 Conn. 282, 292–93, 465 A.2d 294 (1983)], we adopted a lay standard and stated that under the doctrine of informed consent, a physician is obligated to provide the patient with that information which a reasonable patient would have found material for making a decision whether to embark [on] a contemplated course of therapy. . . . We repeatedly have set forth the four elements that must be

addressed in the physician's disclosure to the patient in order to obtain valid informed consent. [I]nformed consent involves four specific factors: (1) the nature of the procedure; (2) the risks and hazards of the procedure; (3) the alternatives to the procedure; and (4) the anticipated benefits of the procedure." (Citations omitted; internal quotation marks omitted.) *Hayes* v. *Camel*, 283 Conn. 475, 476–77 n.3, 927 A.2d 880 (2007).

The plaintiff contends that the evidence adduced at trial supported the conclusion that, by Saturday evening, March 17, the risks and benefits of a VBAC had changed since Pilbin originally consented to the procedure months earlier, and, therefore, at that time, the defendant should have advised Pilbin of those new risks and benefits in order to obtain her consent to proceed with a vaginal delivery, as Pilbin originally had planned. Specifically, the plaintiff maintains that, although the risk of uterine rupture had not changed, Pilbin should have been informed that her chances of a successful VBAC had decreased.[21] The plaintiff asserts that this information was necessary so that Pilbin could reconsider her earlier decision to attempt a vaginal delivery.

We agree with the trial court that Bethel's testimony was insufficient for the jury to determine whether the defendant was required to obtain Pilbin's informed consent to continue efforts to deliver Daniel vaginally. Although Bethel did opine that the likelihood of a vaginal delivery had decreased by the evening of March 17, he did not explain why any such decrease would have been material to Pilbin's decision to undergo an immediate cesarean section. He did not testify about the risks

---

[21] We note that the plaintiff contends that the jury reasonably could have concluded, on the basis of Bethel's testimony, that, as of Saturday evening, March 17, Pilbin's chances of a successful vaginal delivery were remote. We disagree with this characterization of Bethel's testimony. Bethel opined that Pilbin was "remote from delivery" on Saturday evening, not that her overall chances of a successful VBAC were remote.

or hazards accompanying a decision to continue attempting to have a vaginal delivery rather than a delivery by cesarean section. Of course, by opting to attempt a vaginal birth, Pilbin always faced a 1 percent risk of uterine rupture, but there was no testimony, from Bethel or anyone else, to suggest that Pilbin faced any greater risk of uterine rupture, or any new or additional risk, if she continued to attempt to deliver Daniel vaginally after Saturday evening. Similarly, the plaintiff adduced no evidence to establish that any continued efforts by Pilbin to attempt to deliver vaginally placed Daniel at any greater risk. In such circumstances, the jury would have been required to speculate about whether a reasonable patient would have found it material to her decision to continue to attempt a VBAC if she were informed that the likelihood of accomplishing that result had been reduced to some unknown degree. We therefore reject the plaintiff's claim that the trial court improperly directed a verdict for the defendant on the plaintiff's informed consent claim.

### III

The plaintiff's final claim is that the trial court improperly required him to pay for the time that the defendant's expert had spent in preparing for his deposition by the plaintiff. The plaintiff contends that the trial court lacked the authority to make such an award. We disagree with the plaintiff.

After the conclusion of trial, the defendant claimed as a taxable cost the $1800 fee that her expert, James Greenberg, a physician, had charged for time that Greenberg had spent preparing for a deposition that had been noticed and taken by the plaintiff during the course of pretrial discovery. The plaintiff challenged the defendant's claim, asserting that the court lacked the authority to treat such a fee as a taxable cost. The trial court, relying on its reasoning and decision in a

prior case involving the same issue; see *Rolfe* v. *New Britain General Hospital*, 47 Conn. Sup. 296, 790 A.2d 1194 (2001); concluded that, under Practice Book § 13-4 (3),[22] the defendant was entitled to reimbursement for the fee and awarded it to the defendant as part of the court's postjudgment taxation of costs. On appeal, the plaintiff renews his claim that the trial court did not have the authority to shift the cost of Greenberg's deposition preparation from the defendant to the plaintiff.[23] In support of his contention, the plaintiff relies

[22] Practice Book § 13-4 provides in relevant part: "Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of Section 13-2 and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:

"(1) (A) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. (B) Unless otherwise ordered by the judicial authority upon motion, a party may take the deposition of any expert witness disclosed pursuant to subdivision (1) (A) of this rule in the manner prescribed in Section 13-26 et seq. governing deposition procedure generally.

"(2) A party may discover facts known or opinions held by an expert who had been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial only as provided in Section 13-11 or upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means.

"(3) Unless manifest injustice would result, (A) the judicial authority shall require that the party seeking discovery pay the expert a reasonable fee for time spent in responding to discovery under subdivisions (1) (B) and (2) of this rule; and (B) with respect to discovery obtained under subdivision (1) (B) of this rule the judicial authority may require, and with respect to discovery obtained under subdivision (2) of this rule the judicial authority shall require, the party seeking discovery to pay the other party a fair portion of the fees and expenses reasonably incurred by the latter party in obtaining facts and opinions from the expert. . . ."

[23] We note that the plaintiff does not contend that the amount of the award for the time that Greenberg spent preparing for his deposition was unreasonable. The plaintiff's sole claim, rather, is that the court lacked the authority to make the award.

primarily on *M. DeMatteo Construction Co.* v. *New London*, 236 Conn. 710, 717–18, 674 A.2d 845 (1996) (*DeMatteo*), in which this court concluded that the trial court in a tax appeal lacked the authority under General Statutes (Rev. to 1993) § 52-260 (f)[24] to award costs to the prevailing party for fees that that party had paid to its appraiser for his appraisal report.[25]

As the parties have observed, there is a split of authority in the Superior Court as to whether a court has the authority to treat as a taxable cost a fee charged by an expert for time spent preparing for a deposition noticed by the opposing party. Compare *Flis* v. *Connecticut Gastroenterology Consultants, P.C.*, Superior Court, judicial district of New Haven, Docket No. CV-02-0469142-S (July 13, 2007) (43 Conn. L. Rptr. 774) (concluding that court has authority to award costs for time spent by expert preparing for deposition), *Bilotti* v. *General Casualty Co.*, Superior Court, judicial district of Ansonia-Milford, Docket No. CV-04-0085900-S (April 5, 2007) (same), and *1049 Asylum, L.P.* v. *Kinney Pike Ins., Inc.*, Superior Court, judicial district of Hartford, Docket No. CV-02-0816344-S (June 23, 2005) (same), with *Heller* v. *Corvino*, Superior Court, judicial district

---

[24] General Statutes (Rev. to 1993) § 52-260 (f) provides: "When any practitioner of the healing arts as defined in section 20-1, dentist, registered nurse or licensed practical nurse, as defined in section 20-87a, or real estate appraiser is summoned to give expert testimony in any action or proceeding, the court shall determine a reasonable fee to be paid to the practitioner of the healing arts, dentist, registered nurse or licensed practical nurse, as defined in section 20-87a, or real estate appraiser and taxed as part of the costs in lieu of all other witness fees payable to such practitioner of the healing arts, dentist, registered nurse or licensed practical nurse, as defined in section 20-87a, or real estate appraiser."

Unless we specifically refer to the 1993 revision of § 52-260 (f), all references to § 52-260 (f) in this opinion are to the current revision.

[25] In *DeMatteo*, the court also concluded that reimbursement for the appraisal report was not permitted under General Statutes § 12-117a, which generally authorizes a trial court, in its discretion, to award costs in tax appeals. *M. DeMatteo Construction Co.* v. *New London*, supra, 236 Conn. 716–17; see General Statutes § 12-117a. Section 12-117a is not relevant to the present case.

of Stamford-Norwalk, Docket No. CV-97-0160976-S (December 8, 2004) (38 Conn. L. Rptr. 372) (concluding that court lacks authority to award costs for time spent by expert in preparation for deposition), *Temple* v. *Bridgeport Hospital*, Superior Court, judicial district of Fairfield, Docket No. CV-99-0366964-S (May 3, 2002) (same), *Alswanger* v. *Smego*, Superior Court, judicial district of Stamford-Norwalk, Docket No. CV-92-0125294-S (October 12, 2001) (same). The issue is one of first impression for the appellate courts of this state. We agree with the analysis of the trial court in *Rolfe* v. *New Britain General Hospital*, supra, 47 Conn. Sup. 296, and conclude that the trial court properly awarded costs to the defendant for the fee that she incurred for time that Greenberg had spent preparing for his deposition.

Under Practice Book § 13-4 (3), "the judicial authority shall require that the party seeking discovery pay the expert a reasonable fee for time spent in responding to discovery . . . ." As the court in *Rolfe* observed, this language "does not limit the financial responsibility of the party seeking further discovery concerning an expert's testimony to the expert's time at the deposition and is broad enough to include payment of a reasonable fee not only for testimony but also for preparation . . . ." *Rolfe* v. *New Britain General Hospital*, supra, 47 Conn. Sup. 302. Indeed, as one federal District Court has noted in analyzing the identical language of rule 26 (b) (4) (C) (i) of the Federal Rules of Civil Procedure,[26]

---

[26] Rule 26 (b) (4) of the Federal Rules of Civil Procedure provides in relevant part:

"(A) Expert Who May Testify. A party may depose any person who has been identified as an expert whose opinions may be presented at trial. . . .

"(C) Payment. *Unless manifest injustice would result, the court must require that the party seeking discovery*:

"(i) *pay the expert a reasonable fee for time spent in responding to discovery under Rule 26 (b) (4) (A) or (B)*; and

"(ii) for discovery under (B), also pay the other party a fair portion of the fees and expenses it reasonably incurred in obtaining the expert's facts and opinions." (Emphasis added.)

"[t]ime spent preparing for a deposition is, literally speaking, time spent in responding to discovery . . . ." *Collins* v. *Woodridge*, 197 F.R.D. 354, 357 (N.D. Ill. 1999). Furthermore, it is an entirely foreseeable consequence of noticing the deposition of an expert witness that the expert will devote at least some time to preparing for his or her deposition.

In *Rolfe*, the court also concluded that "the genesis and evolution of [Practice Book § 13-4 (3)] as well as the application of the identical federal rule support such an interpretation." *Rolfe* v. *New Britain General Hospital*, supra, 47 Conn. Sup. 302. Practice Book § 13-4 (3) is modeled after rule 26 (b) (4) (C) of the Federal Rules of Civil Procedure, the purpose of which is to "meet the objection that it is unfair to permit one side to obtain without cost the benefit of an expert's work for which the other side has paid, often a substantial sum." Fed. R. Civ. P. 26, advisory committee note of 1970. Construing Practice Book § 13-4 (3) to permit reimbursement for time spent by an expert in preparing for his or her deposition furthers that purpose. Moreover, comments to the 1978 revisions to the Practice Book indicate that, in light of the rule set forth in Practice Book § 13-4 (3), "the fee aspects to further discovery will have to be weighed by any party in deciding to seek further discovery . . . ." R. Ciulla & R. Allen, Comments on the New Practice Book Revisions (1979) c. 8, p. 19. This commentary suggests that the time that an expert spends in preparing for his or her deposition falls within the purview of Practice Book § 13-4 (3) because, if it did not, the party taking the deposition could do so without having to consider the expert's fee for time spent in preparing for the deposition. Indeed, as the court in *Rolfe* noted, the cost associated with the time that an expert spends preparing to be deposed is "incurred only because of [the] actions of the opposing party, who is in control of the entire process from

the decision to depose the expert to the scope of the material subpoenaed for the deposition, and, thus, the scope of matters into which inquiry will be made as to the length and detail of the questioning at the deposition. . . . [I]t [therefore] is counterproductive to the goal of the speedy and efficient determination of litigation [on] its merits . . . to permit the parties to take all the depositions they want without responsibility for the costs generated by those depositions." (Citation omitted; internal quotation marks omitted.) *Rolfe* v. *New Britain General Hospital*, supra, 308. Finally, although federal courts are divided on the issue, it appears that a majority of those courts that have decided the issue have concluded that rule 26 (b) (4) (C) of the Federal Rules of Civil Procedure permits the court to tax as a cost the fee charged by an expert for time spent preparing for his or her deposition. See *Magee* v. *Paul Revere Life Ins. Co.*, 172 F.R.D. 627, 646 (E.D.N.Y. 1997) (stating that "[m]ost" federal courts have determined that time spent by expert preparing for deposition is taxable to party noticing deposition).

The plaintiff contends that this court's holding in *DeMatteo* bars the trial court's award in the present case. We disagree with the plaintiff's reading of *DeMatteo*. In that case, the plaintiff, M. DeMatteo Construction Company (DeMatteo), appealed to the Superior Court from the decision of the board of tax review of the defendant city of New London (city), which declined to reduce the assessed value of DeMatteo's property. *M. DeMatteo Construction Co.* v. *New London*, supra, 236 Conn. 711–12. On appeal to the Superior Court, DeMatteo presented the testimony of a real estate appraiser, who testified that the fair market value of the property was considerably less than the assessed value. Id., 713. DeMatteo also introduced into evidence an appraisal report that that appraiser had prepared detailing his conclusions. Id. After the trial court ren-

dered judgment in favor of DeMatteo, DeMatteo submitted a bill of costs seeking, inter alia, reimbursement for the fee that it had paid to the appraiser for the preparation of his report. Id. The trial court declined to tax the cost of the appraisal report, concluding that it lacked the statutory authority to do so. Id., 714.

On appeal to this court, DeMatteo asserted that the trial court was authorized to award such costs under General Statutes (Rev. to 1993) § 52-260 (f); see footnote 24 of this opinion; which provides in relevant part that "the court shall determine a reasonable fee to be paid to" any designated health care provider or real estate appraiser who "is summoned to give expert testimony in any action or proceeding . . . ."[27] General Statutes (Rev. to 1993) § 52-260 (f). The plaintiff claimed that, "because the work necessary to the preparation of an appraisal report is also essential to the appraiser's sworn testimony, the fee for the report must also be a taxable cost under the statute." *M. DeMatteo Construction Co.* v. *New London,* supra, 236 Conn. 714. We rejected DeMatteo's claim, concluding that the language of General Statutes (Rev. to 1993) § 52-260 (f) was not sufficiently clear and unequivocal to overcome the common-law principle that parties are required to bear their own litigation expenses. Id., 717–18.

As the court explained in *Rolfe,* however, the issue raised in *DeMatteo* was whether the trial court was statutorily authorized to require the city to pay for the time that DeMatteo's appraiser had spent preparing his *report,* not the time that the appraiser had spent prepar-

[27] We note that the current revision of § 52-260 (f) provides that such costs may be awarded when the health care provider or real estate appraiser "gives expert testimony in any action or proceeding, *including by means of a deposition* . . . ." (Emphasis added.) General Statutes § 52-260 (f). The legislature added this italicized language subsequent to our decision in *DeMatteo.* See Public Acts 2001, No. 01-32, § 1 (effective October 1, 2001).

ing *to testify at trial.*[28] *Rolfe* v. *New Britain General Hospital,* supra, 47 Conn. Sup. 300. In *DeMatteo,* therefore, we did not decide whether the trial court had the statutory authority to award costs to DeMatteo for the fee that it had incurred for its appraiser's trial preparation time. We agree with the court in *Rolfe* that our holding in *DeMatteo* does not preclude a court from awarding the costs associated with the time that an expert witness spends preparing for a deposition.[29]

The plaintiff nevertheless maintains that, because § 52-260 (f) does not expressly provide for reimbursement for the cost of the time that an expert spends in preparing for a deposition, it should not be construed to do so. We acknowledge that costs are a creature of statute, and, therefore, a court may not tax a cost unless it is clearly empowered to do so; e.g., *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership,* 272 Conn. 14, 48, 861 A.2d 473 (2004); because statutes in derogation of the common law are to be strictly construed. E.g., *Viera* v. *Cohen,* 283 Conn. 412, 426, 927 A.2d 843 (2007). As the court in *Rolfe* explained, however, strict construction does not require "giving the words of a statute the narrowest meaning of which they are susceptible . . . and [the principle of] strict construction is in no way violated if the words of [the] statute are given their full meaning." (Internal quotation marks omitted.)

---

[28] As the court in *Rolfe* also noted, DeMatteo had sought reimbursement in the amount of $12,000 for the cost of the appraiser's report. *Rolfe* v. *New Britain General Hospital,* supra, 47 Conn. Sup. 300 n.4; see *M. DeMatteo Construction Co.* v. *New London,* supra, 236 Conn. 713. By contrast, DeMatteo sought, and was awarded, $2100 for its appraiser's expert testimony. *M. DeMatteo Construction Co.* v. *New London,* supra, 713 n.5.

[29] It is true that, in *DeMatteo,* this court observed that General Statutes (Rev. to 1993) § 52-260 (f) applied only to costs arising from an expert's testimony at trial. *M. DeMatteo Construction Co.* v. *New London,* supra, 236 Conn. 717. Following our decision in *DeMatteo,* however, § 52-260 (f) was amended to include expert testimony "by means of a deposition . . . ." Public Acts 2001, No. 01-32, § 1; see footnote 27 of this opinion. Thus, the legislature has overruled that portion of *DeMatteo* limiting § 52-260 (f) to fees incurred in connection with an expert's trial testimony.

*Rolfe* v. *New Britain General Hospital,* supra, 47 Conn. Sup. 306; see also *Spears* v. *Garcia,* 263 Conn. 22, 35, 818 A.2d 37 (2003) ("[T]he principle of narrowly construing statutes that purport to change the common law is not an absolute rule, but rather merely an important [guideline] to the determination of legislative meaning. To permit [the construction of the statute] to displace the conclusions that careful interpretation yields . . . would be a disservice to the legislative process, as well as to the judicial exercise of interpreting legislative language based [on] the premise that the legislature intends to enact reasonable public policies." [Internal quotation marks omitted.]).

In the present case, the plain terms of Practice Book § 13-4 (3) encompass the costs associated with time spent by an expert in preparation for his or her deposition. We see no reason why the broad language of § 52-260 (f) should be narrowly construed to conflict with the clear import of Practice Book § 13-4 (3). Moreover, the fact that § 52-260 (f) recently was amended to include costs incurred in connection with an expert's testimony by means of a deposition; see Public Acts 2001, No. 01-32, § 1; supports the conclusion that § 52-260 (f) was not intended to bar the taxing of costs for the time spent by an expert in preparation for a deposition. We therefore conclude that the trial court's award of costs to the defendant for the fee that she incurred for Greenberg's time in preparing for his deposition was proper.[30]

The judgment is affirmed.

In this opinion the other justices concurred.

---

[30] We note that our decision today does not represent a marked departure from the principle that parties to a case generally are responsible for their own expenses and burdens of litigation because our holding applies equally to plaintiff's experts and defendant's experts irrespective of which party prevails at trial. Moreover, prior to an expert having his or her deposition noticed by the opposing party, that expert already will have spent considerable time examining records and other relevant information for the purpose

of giving the opinion that led to his or her retention as an expert. Of course, that time does not fall within the purview of Practice Book § 13-4 (3) or § 52-260 (f).