## PEMIOLA DEMIRAJ ET AL. *v.* TOM ULJAJ ET AL. (AC 33219)

DiPentima, C. J., and Espinosa and Bishop, Js.

Argued April 24—officially released September 4, 2012

*Anthony R. Minchella,* with whom, on the brief, was *Elizabeth Lachterman,* for the appellants (plaintiffs).

*Kenneth G. Bartlett,* for the appellees (defendants).

*Opinion*

DiPENTIMA, C. J. The plaintiffs, Pemiola Demiraj, individually and doing business as Eagle Agency, and Halim Demiraj, appeal from the judgment of the trial court, following a jury trial, in favor of the defendants, Tom Uljaj, Eli Gjezo and Adriatic Eagle Air Corporation (Adriatic). On appeal, the plaintiffs claim that the court improperly directed a verdict in favor of the defendants on two counts alleging violations of the Connecticut

Uniform Securities Act (CUSA), General Statutes § 36b-2 et seq., and specifically General Statutes § 36b-4 (a) and (b). We reverse in part the judgment of the trial court.

The following facts, construed in the light most favorable to the plaintiffs, reasonably are taken from the record. See *Levesque* v. *Bristol Hospital, Inc.*, 286 Conn. 234, 253, 943 A.2d 430 (2008). Pemiola Demiraj and Halim Demiraj are residents of Waterbury, and Eagle Agency is a travel agency owned and operated by Pemiola Demiraj in Waterbury. Uljaj and Gjezo are residents of New York and owners of Adriatic, a New York corporation. Adriatic is in the air travel business, specifically the advertising and sale of airline tickets and the operation of international flights from the United States to locations including Albania and Kosovo. The plaintiffs met with Uljaj and Gjezo in Waterbury to discuss the possibility of investing in Adriatic. At this meeting, Uljaj and Gjezo told the plaintiffs how successful this business would be, that it was worth $5 million, that all of the necessary permits were in place and that if they joined as 25 percent partners, their share would be $1,250,000.

In June, 2007, Pemiola Demiraj and Halim Demiraj entered into a stock purchase agreement (agreement) with Adriatic, in which they agreed to purchase 25 percent of the then issued and authorized shares of Adriatic's common stock for $1,225,000. The purchase was to be paid in installments, with $250,000 payable on or before the execution date of the agreement, $250,000 in two equal payments of $125,000 due on July 10 and August 10, 2007, and $725,000 in monthly payments of $10,000 per month, starting in October, 2007. The agreement also provided that the shares of Adriatic being purchased would remain in Adriatic's possession until the purchase price was paid in full. The plaintiffs made the initial payment of $250,000 before the

agreement was signed. Subsequent to the execution of the agreement, Adriatic ceased its flight operations because it was not generating the income from reservations necessary to meet its expenses. When the plaintiffs learned that no gain would be realized from their investment, and upon learning that their initial $250,000 payment made to Adriatic would not be recouped, the relationship between the parties broke down.

In October, 2010, the plaintiffs filed their first amended complaint against the defendants seeking damages and equitable relief. The plaintiffs' eleven count complaint alleged violations of CUSA, and the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., as well as rescission, fraud, breach of contract, statutory theft and breach of the covenant of good faith and fair dealing. The case proceeded to trial, and the defendants filed a motion for a directed verdict. The defendants argued that (1) there was insufficient evidence as a matter of law to support a verdict against either Uljaj or Gzejo, individually and (2) there were insufficient contacts with Connecticut to permit the application of Connecticut law to the facts of the case. The court granted the defendants' motion for a directed verdict as to counts one, two and three alleging violations of CUSA, and as to count nine alleging statutory theft.[1]

After trial, the jury returned a verdict in favor of the plaintiffs as to counts ten and eleven alleging violations of the breach of the covenant of good faith and fair dealing and awarded damages in the amount of $162,722.46. The jury found in favor of the defendants on the remaining counts. The plaintiffs filed a motion

---

[1] We note that the third count of the plaintiffs' complaint also alleged a violation of CUSA under General Statutes § 36b-6 (c). On appeal, the plaintiffs do not challenge the court's granting of a directed verdict as to this count. They also do not challenge the court's granting of a directed verdict as to the statutory theft count.

to set aside the verdict on the breach of contract and CUTPA counts, for judgment notwithstanding the verdict, or for a new trial, and additur as to the bad faith count, which the court denied. Accordingly, the court rendered judgment in accordance with the jury's verdict. This appeal followed.

On appeal, the plaintiffs claim that the court improperly directed a verdict in favor of the defendants. Specifically, the plaintiffs argue that there was sufficient evidence to support the application of CUSA, § 36b-4 (a) and (b), and, accordingly, the court should not have directed a verdict in favor of the defendants as to counts one and two of their complaint. We agree with the plaintiffs.

We first set forth the applicable standard of review. "Whether the evidence presented by the plaintiff was sufficient to withstand a motion for a directed verdict is a question of law, over which our review is plenary. . . . Directed verdicts are not favored. . . . A trial court should direct a verdict only when a jury could not reasonably and legally have reached any other conclusion. . . . In reviewing the trial court's decision to direct a verdict in favor of a defendant we must consider the evidence in the light most favorable to the plaintiff. . . . Although it is the jury's right to draw logical deductions and make reasonable inferences from the facts proven . . . it may not resort to mere conjecture and speculation. . . . A directed verdict is justified if . . . the evidence is so weak that it would be proper for the court to set aside a verdict rendered for the other party. . . . This court has emphasized two additional points with respect to motions to set aside a verdict that are equally applicable to motions for a directed verdict: First, the plaintiff in a civil matter is not required to prove his case beyond a reasonable doubt; a mere preponderance of the evidence is sufficient. Second, the well established standards compelling great deference

to the historical function of the jury find their roots in the constitutional right to a trial by jury." (Citations omitted; internal quotation marks omitted.) *Curran* v. *Kroll*, 303 Conn. 845, 855–56, 37 A.3d 700 (2012).

The plaintiffs claim that there is sufficient evidence to support the application of CUSA because the defendants' conduct at the Waterbury meeting constituted an "offer" to sell securities under General Statutes § 36b-3 (16). This claim raises an issue of statutory interpretation over which our review is plenary. "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning [General Statutes] § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Urich* v. *Fish*, 112 Conn. App. 837, 841, 965 A.2d 567, cert. denied, 292 Conn. 909, 973 A.2d 109 (2009).

We begin our analysis with the relevant statutory language. CUSA governs the purchase and sale of securities. Section 36b-4 (a) provides: "No person shall, in connection with the offer, sale or purchase of any security, directly or indirectly: (1) Employ any device,

scheme or artifice to defraud; (2) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." Section 36b-4 (b) provides: "No person shall, in connection with the offer, sale or purchase of any security, directly or indirectly engage in any dishonest or unethical practice." Further, § 36b-3 (16) (A) defines a " 'sale' " of securities as including "every contract of sale of, contract to sell, or disposition of, a security or interest in a security for value," and § 36b-3 (16) (B) defines an " 'offer' " to sell securities as "every attempt or offer to dispose of, or *solicitation of an offer to buy*, a security or interest in a security for value." (Emphasis added.)

Section 36b-4 corresponds to § 101 of the Uniform Securities Act of 1956 (Uniform Securities Act).[2] See *Connecticut National Bank* v. *Giacomi*, 233 Conn. 304, 319, 659 A.2d 1166 (1995).[3] Because CUSA is a "substantial adoption of the major provisions of the . . . Uniform Securities Act, we may look to interpretations of

[2] Section 101 of the Uniform Securities Act of 1956 provides: "[Sales and Purchases.] It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly

"(1) to employ any device, scheme, or artifice to defraud,

"(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or

"(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

[3] We note that § 101 of the Uniform Securities Act "was modeled on rule 10b-5 of the Securities and Exchange Commission (SEC), which, in turn, was modeled on § 17 (a) of the federal Securities Act of 1933. L. Loss, Commentary on the Uniform Securities Act (1976) official comment to § 101, p. 6. Although modeled on § 17 (a), rule 10b-5 was promulgated by the SEC pursuant to its authority under § 10 (b) of the Securities Exchange Act of 1934." *Connecticut National Bank* v. *Giacomi*, supra, 233 Conn. 321.

that act in interpreting analogous language in our own statutes." *Lehn* v. *Dailey*, 77 Conn. App. 621, 631–32, 825 A.2d 140 (2003). Moreover, in our review of § 36b-4, it is "instructive to consider the accepted interpretations of rule 10b-5 [of the Securities and Exchange Commission]" at the time the Uniform Securities Act was adopted. *Connecticut National Bank* v. *Giacomi*, supra, 322. Finally, this court has stated that "where the interpretations of rule 10b-5 and the analogous language of the Uniform Securities Act have diverged since 1956, it is the jurisprudence under the Uniform Securities Act that is most compelling." *Lehn* v. *Dailey*, supra, 633.

In directing a verdict in favor of the defendants as to the counts alleging violations of CUSA, specifically § 36b-4 (a) and (b), the court noted that General Statutes § 36b-33 provides that General Statutes §§ 36b-4, 36b-5, 36b-6, 36b-16, 36b-24 and 36b-29 apply to persons who "sell or offer to sell when an offer to sell is made *in this state*, or when the offer to buy is made and accepted in this state." (Emphasis added.) The court stated that it had not "heard evidence that would make this—this statute applicable, and therefore, [it was] going to direct out those three counts as to [CUSA]." Thus, the court determined that the plaintiffs had not presented sufficient evidence to show that an offer to sell shares of Adriatic was made in Connecticut to support a cause of action under CUSA.[4]

---

[4] In August, 2011, the plaintiffs, with the consent of the defendants, filed a motion for permission to file a late motion for articulation, which this court denied. The defendants argue that there is an inadequate record for our review of the plaintiffs' claim because "[w]ithout an articulation, both counsel, as well as this court, are essentially left to speculate" as to the court's reasoning in granting the defendants' motion for a directed verdict on the CUSA counts. We disagree.

In granting the defendants' motion for a directed verdict, the court stated that CUSA applies to persons who "sell or offer to sell when an offer to sell is made in this state or when the offer to buy is made and accepted in this state." It is well established that the appellant bears the burden of providing an appellate court with an adequate record for review. Practice

The jury reasonably could have concluded, however, that the defendants solicited the plaintiffs' investment in 25 percent of the shares of Adriatic when the parties met in Waterbury. Solicitation qualifies as an "offer" under § 36b-3 (16) (B) and, therefore, the court should not have granted a verdict in the defendants' favor.[5] The United States Supreme Court, interpreting the Securities Act of 1933, has determined that liability extends to a person who solicits a purchase of securities while motivated "at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter* v. *Dahl*, 486 U.S. 622, 647, 108 S. Ct. 2063, 100 L. Ed. 2d 658 (1988). The Supreme Court also stated that Congress did not intend to impose liability on participants "collateral" to the offer or sale. Id., 650.[6]

Uljaj and Gjezo are owners of Adriatic, and the jury reasonably could have concluded that their interactions

---

Book § 61-10. Here, the court emphasized that it had not "heard evidence that would make [CUSA] applicable, and therefore, I am going to direct out those three counts . . . ." Thus, the court's basis for granting the directed verdict was that it had not heard sufficient evidence to show that there was an offer to buy or sell a security in the state of Connecticut. The court sufficiently set forth the factual and legal basis for its decision. Accordingly, we conclude that the record is adequate for our review.

[5] It is undisputed that the shares of Adriatic qualify as securities within CUSA. General Statutes § 36b-3 (19) defines "security" in relevant part as "any note, stock, treasury stock, security future, bond, debenture, evidence of indebtedness . . . ."

[6] Several cases from other jurisdictions, interpreting similar provisions of the Uniform Securities Act, have cited *Pinter* v. *Dahl*, supra, 486 U.S. 622, 647, in determining whether a solicitation had occurred. See, e.g., *Bennett* v. *Durham*, United States Court of Appeals, Docket Nos. 11-5782, 11-5918 (6th Cir. June 28, 2012); *Shaw* v. *Digital Equipment Corp.*, 82 F.3d 1194, 1215 (1st Cir. 1996); *F.W. Webb Co.* v. *State Street Bank & Trust Co.*, United States District Court, Docket No. 09 Civ. 1241 (RJH) (S.D.N.Y. August 12, 2010). The majority of these cases have considered the meaning of "solicit" where the alleged solicitor was not the owner of the securities. We see no reason, however, why owners of securities cannot also engage in solicitation under CUSA. Accordingly, we consider and find instructive the Supreme Court's reasoning in *Pinter*.

with the plaintiffs at the Waterbury meeting constituted a solicitation under § 36b-3 (16), and that their conduct was motivated at least in part by a desire to serve their financial interests as owners. Here, Pemiola Demiraj testified that at the Waterbury meeting, Uljaj and Gjezo "talked about this being a wonderful business, a good opportunity to invest, the potential that it had. They were talking [about] what they had accomplished so far, that they were just ready to go, ready to fly."[7] She testified that the purpose of the meeting was to discuss forming a "partnership." She stated that Uljaj and Gjezo represented to her that Adriatic was worth $5 million, and that if they joined as 25 percent partners, their share would be $1,250,000. Moreover, she testified that they told her that the first two flights were paid, that all of the permits were in place, that all the advertisements were made and that her confidence in Adriatic increased after this dinner meeting. Finally, she testified that Gjezo told her that "being such a successful business it's going to be hard for us to give you 25 percent of the shares." In viewing, as we must, the evidence in the light most favorable to the plaintiffs, the jury reasonably could have concluded that the conduct of Uljaj and Gjezo in Connecticut constituted a solicitation within the meaning of § 36b-3. The court, therefore, improperly directed a verdict in favor of the defendants as to counts one and two of the plaintiffs' complaint.

The judgment is reversed in part and the case is remanded for a new trial on counts one and two of the plaintiffs' complaint. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

---

[7] We note that neither the plaintiffs nor the defendants have provided this court with transcripts of the entire testimony at trial, and our review of the evidence is limited to the record before us.