MICHAEL SMITH ET AL. *v.* RAYMOND
ANDREWS ET AL.
(SC 17745)

Katz, Palmer, Vertefeuille, Zarella and Schaller, Js.

Argued February 6—officially released October 21, 2008

*Steven D. Ecker,* with whom, on the brief, were *James T. Cowdery, Russell Berkowitz* and *Danielle DiBerardini-Albrecht,* for the appellants (plaintiffs).

*James B. Rosenblum,* with whom was *James Newfield,* for the appellees (named defendant et al.).

*Opinion*

SCHALLER, J. In this medical malpractice action, the named plaintiff, Michael Smith,[1] appeals from the trial

---

[1] Sharon Smith, Michael Smith's wife, filed a claim for loss of consortium and is also a plaintiff in this action. For convenience, all references to the plaintiff in this opinion are to Michael Smith.

court's judgment,[2] rendered after a jury verdict in favor of the defendants, Raymond Andrews, an anesthesiologist, and Medical Anesthesiology Associates, P.C. (Medical Anesthesiology).[3] The plaintiff claims that: (1) the trial court improperly admitted evidence of a local standard of care with respect to the method of intubation performed on the plaintiff prior to surgery; (2) the trial court improperly permitted defense counsel to ask a prejudicial and confusing hypothetical question as to the standard of care that misled the jury; (3) defense counsel engaged in various improprieties during trial; and (4) the trial court improperly awarded various trial costs to the defendants. We affirm the judgment of the trial court as to the first three issues; we affirm in part and reverse in part the judgment of the trial court awarding costs to the defendants.

The jury reasonably could have found the following facts. On August 6, 2001, the plaintiff underwent disk surgery to alleviate neck injuries related to a slip and fall incident. Abraham Mintz and Gerard Girasole, orthopedic surgeons, performed the surgery at St. Vincent's Hospital (St. Vincent's) in Bridgeport.[4] Prior to surgery, Andrews and Alana Rotondi,[5] a nurse anesthetist, intubated the plaintiff utilizing a standard endotra-

---

[2] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

[3] At all times relevant to the present action, Andrews was an employee of Medical Anesthesiology.

[4] Mintz, Girasole, St. Vincent's, the Orthopaedic and Sports Medicine Center, Yale-New Haven Hospital and Alain De Lotbiniere, a neurosurgeon, also were named as defendants in the plaintiff's complaint, but the plaintiff settled the case against those defendants prior to trial, and the settling parties remained in the case for apportionment purposes only. All references to the defendants in this opinion are to Andrews and Medical Anesthesiology only.

[5] At all times relevant to the present action, Rotondi was an employee of Medical Anesthesiology.

cheal intubation by laryngoscopy.[6] During the surgical process, the plaintiff suffered a severe spinal cord injury. Despite subsequent surgeries, the plaintiff is a paraplegic.

The plaintiff instituted the present action alleging that his injuries were caused by the negligence of the defendants. The controversy centers on whether the method of endotracheal intubation used by the defendants complied with the applicable national standard of care used to anesthetize a patient in the plaintiff's condition or whether the standard of care required the defendants to use an awake fiber-optic intubation method. The primary factual issue at trial revolved around the plaintiff's condition—that is whether there was a medical distinction between a patient with "instability" in his spine and a patient with an "unstable" spine. During trial, each side offered conflicting expert testimony regarding the plaintiff's condition and the corresponding standard of care.

At the close of evidence, the trial court charged the jury that the applicable standard of care to determine whether the defendants were liable is a national standard of care.[7] After three days of deliberation, the jury returned a verdict for the defendants. In its answer to an interrogatory, the jury indicated that it found that the defendants did not breach the standard of care. Subsequently, the plaintiff filed a motion to set aside the verdict and for a new trial, which the trial court denied. This appeal followed.

---

[6] According to the record, in the endotracheal intubation method, an anesthesiologist uses a laryngoscope to place the endotracheal tube into the trachea under direct vision.

[7] Specifically, the trial court instructed that "[a] specialist such as . . . Andrews and his nurse anesthetist is held to the same prevailing professional standard of care applicable to anesthesiologists, including those nurse anesthetists who perform anesthesia such as oral intubation in cervical surgery across the nation."

## I

We first address the plaintiff's claim that the trial court improperly admitted evidence of a local standard of care for anesthesiologists regarding the methods of intubation practiced at St. Vincent's. The plaintiff argues that such evidence is irrelevant because the law requires the defendants' conduct to be evaluated in terms of a national standard of care. We conclude that the evidence establishing the standard of care at St. Vincent's was relevant to support the defendants' contention that the use of standard endotracheal intubation complied with the applicable national standard of care for a patient in the plaintiff's condition. The trial court properly admitted the evidence.

The following additional facts and procedural history are necessary for our resolution of this claim. In their evaluation of the plaintiff's preoperative condition, the treating surgeons, Mintz and Girasole, diagnosed the plaintiff as having "instability" in his spine.[8] As noted, prior to surgery, the defendants intubated the plaintiff utilizing standard endotracheal intubation.

To avoid confusion, we start out by simplifying the parties' claims. The plaintiff argues that the terms "instability" and "unstable" are synonymous—both mean that the spine is unstable—and that the standard of care for a patient with an unstable spine requires fiber-optic intubation. The defendants agree that the standard of care for a patient with an unstable spine requires fiber-optic intubation.[9] The defendants dispute,

---

[8] The plaintiff's medical record consistently labeled the plaintiff's condition as "instability" in the spine.

[9] Although there was mild disagreement about whether any physical manipulation of the neck occurs during fiber-optic intubation, the parties did not dispute that the primary practical difference between the two standards of care is that fiber-optic intubation requires less physical manipulation of the neck during intubation than the endotracheal intubation method. According to the testimony, both parties agreed that utilizing endotracheal intubation on a patient with an unstable spine would breach the standard of care because the physical manipulation of the neck during that procedure could result in a spinal cord injury.

however, that the plaintiff's spine was unstable. Instead, the defendants contend that instability is medically distinguishable from unstable.[10] Therefore, the defendants argue, the standard of care for a patient with cervical instability permits endotracheal intubation.[11] Despite the apparent congruence of instability and unstable, both Mintz and Girasole[12] testified that these terms represent two different degrees of injury—that is, an unstable spine is an acute, more serious condition such as a traumatic injury, whereas a spine with instability is a chronic, less serious condition in which the spine is basically stable. The record reveals no instance in which the plaintiff disputed that the standard of care for a patient with a stable spine permits endotracheal intubation.

The plaintiff contends that no medical distinction exists between an unstable spine and a spine with instability. According to the plaintiff, therefore, fiber-optic intubation was the only relevant standard of care. Roger Kaye, a neurosurgeon who testified as an expert for the plaintiff, stated that the defendants were "trying to draw a distinction between [two] words where [he found] no distinction." Similarly, Floyd Heller, the plaintiff's anesthesiology expert, testified that the two terms represented the same condition. In fact, only the witnesses affiliated with St. Vincent's distinguished between the terms instability and unstable in their practice.

---

[10] A fair reading of the record reveals that the defendants' basic argument at trial was that Mintz and Girasole distinguish between the two terms. The defendants did not seriously contend that surgeons across the nation also distinguish between the terms.

[11] Prior to trial, the plaintiff filed a motion in limine seeking to prevent the admission of evidence regarding intubation of a patient with "instability" by anesthesiologists practicing at St. Vincent's. The plaintiff argued that such evidence was inadmissible evidence regarding a purely local standard of care. The trial court denied the motion.

[12] Mintz was called, under subpoena, as a witness for the plaintiff, while Girasole testified as a defense witness.

We begin our analysis with the standard of review. The trial court's ruling is governed by an abuse of discretion standard. "The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence . . . [and its] ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Internal quotation marks omitted.) *Jacobs* v. *General Electric Co.*, 275 Conn. 395, 406, 880 A.2d 151 (2005). Furthermore, "[b]efore a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful. . . . The harmless error standard in a civil case is whether the improper ruling would likely affect the result. . . . When judging the likely effect of such a trial court ruling, the reviewing court is constrained to make its determination on the basis of the printed record before it. . . . In the absence of a showing that the [included] evidence would have affected the final result, its [inclusion] is harmless." (Internal quotation marks omitted.) *Desrosiers* v. *Henne*, 283 Conn. 361, 366, 926 A.2d 1024 (2007).

General Statutes § 52-184c (a) governs the standard of care for liability in medical malpractice cases.[13] In

[13] General Statutes § 52-184c (a) provides: "In any civil action to recover damages resulting from personal injury or wrongful death occurring on or after October 1, 1987, in which it is alleged that such injury or death resulted from the negligence of a health care provider, as defined in section 52-184b, the claimant shall have the burden of proving by the preponderance of the evidence that the alleged actions of the health care provider represented a breach of the prevailing professional standard of care for that health care provider. The prevailing professional standard of care for a given health care provider shall be that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers."

*Logan* v. *Greenwich Hospital Assn.*, 191 Conn. 282, 301, 465 A.2d 294 (1983), we considered whether the standard of care should be limited geographically and concluded that the historical distinction between a statewide and national standard of care was no longer warranted because "[u]nder contemporary conditions there is little reason to retain this vestige of former times when there was a substantial basis for believing that the rural doctor should not be held to the standards of the urban doctor, since the latter had greater access to new theories and had more opportunity to refine his method of practice. . . . We are not aware of any differences in the educational background and training of physicians practicing in Connecticut compared with those in other states. Medical literature of significance is normally disseminated throughout this country and not confined to a particular state." (Citation omitted; internal quotation marks omitted.) Id., 301–302. In malpractice cases, "[t]he requirement of expert testimony . . . serves to assist lay people, such as members of the jury and the presiding judge, to understand the applicable [national] standard of care and to evaluate the defendant's actions in light of that standard." (Internal quotation marks omitted.) *Grayson* v. *Wofsey, Rosen, Kweskin & Kuriansky*, 231 Conn. 168, 188–89, 646 A.2d 195 (1994). In light of *Logan*, we conclude that expert testimony establishing a standard of care at a particular hospital is relevant *only if* it comports with an accepted, applicable national standard of care.[14] See *Baxter* v. *Cardiology Associates of New Haven*, 46 Conn. App. 377, 390–91, 699 A.2d 271 (affirming trial court's exclusion, on relevancy grounds, of evidence related to procedures followed by hospital personnel for obtaining blood, and stating that evidence "would be relevant only if it was later supported by expert

[14] Indeed, the plaintiff's counsel conceded this point during argument on his postverdict motion before the trial court.

testimony that a cardiologist would rely on a resident to order blood on an expeditious basis"), cert. denied, 243 Conn. 933, 702 A.2d 640 (1997); *Koontz* v. *Ferber*, 870 S.W.2d 885, 892 (Mo. App. 1993) ("[hospital] rules and regulations are not admissible to establish negligence *unless* expert testimony is offered to establish the standard of care" [emphasis added]).

In the present case, the defendants offered sufficient expert testimony to link the practices at St. Vincent's regarding the intubation of a patient in the plaintiff's condition with a national standard of care. Several defense witnesses testified as to the standard of care practiced by anesthesiologists at St. Vincent's. Mintz testified that the "overwhelming majority" of the 500 to 750 disk surgeries he had performed at St. Vincent's, prior to the plaintiff's disk surgery, utilized standard endotracheal intubation. Similarly, Thomas Bladek,[15] an anesthesiologist and chair of the anesthesiology department at St. Vincent's, testified that there were unwritten protocols at St. Vincent's for anesthesiologists to utilize standard endotracheal intubation with laryngoscopy for patients with spinal "instability." Andrews also testified that since the 1990s, it was consistent with his practice to use endotracheal intubation for a patient in the plaintiff's condition. In the absence of expert testimony linking the St. Vincent's practice to a national standard of care, the evidence would be inadmissible as irrelevant. The testimony of Jonathan Griswold, the defendants' anesthesiology expert, however, linked the St. Vincent's practice to an accepted national standard. In response to a hypothetical question, Griswold testified that "looking at the standard of practice at [St. Vincent's] at the time and I think for—in most places *around the country*, for cervical diskectomies," the standard of care is standard endotracheal intubation rather than fiber-

---

[15] At all times relevant to the present action, Bladek was a partner in Medical Anesthesiology.

optic intubation. (Emphasis added.) Although Griswold's testimony was not a model of clarity, his testimony, as reflected in the trial transcripts, indicates that he considered standard endotracheal intubation to be the applicable standard of care for a patient in the plaintiff's condition, both at St. Vincent's and at other institutions around the country. The trial court, therefore, did not abuse its discretion in admitting testimony regarding the standard of care utilized by anesthesiologists at St. Vincent's because there was sufficient expert testimony linking that standard of care to an accepted national standard.

The plaintiff contends, nevertheless, that evidence of the local practice at St. Vincent's was irrelevant evidence of a local standard of care. We are not persuaded. The flaw in the plaintiff's argument is that it presupposes that the jury found that an "unstable" spine and a spine with "instability" represent the same degree of injury. Such an assumption would render evidence of the local standard of care irrelevant because neither party disputed that an unstable spine required fiberoptic intubation. In other words, the only way that evidence regarding the practices at St. Vincent's can be irrelevant—and therefore inadmissible—is if the defendants had presented insufficient evidence distinguishing the two terms as distinct medical conditions. As we shall further explain, however, the defendants produced sufficient evidence to warrant a finding by the jury that the two conditions were different, and that a different standard of care applied—standard endotracheal or fiber-optic intubation—depending on its determination of the plaintiff's spinal condition. Although, admittedly, the lay distinction between these two terms appears strained, we must construe the evidence in the light most favorable to sustaining the jury's verdict. *State* v. *Silva*, 285 Conn. 447, 461, 939 A.2d 581 (2008). Moreover, the jury is under no obligation to credit the evi-

dence offered by any witnesses, including experts; *Johnson* v. *Healy*, 183 Conn. 514, 516–17, 440 A.2d 765 (1981); *Smith* v. *Smith*, 183 Conn. 121, 123, 438 A.2d 842 (1981); even if that evidence is uncontroverted. *Pisel* v. *Stamford Hospital*, 180 Conn. 314, 344, 430 A.2d 1 (1980). "[T]he acceptance or rejection of an opinion of a qualified expert is a matter for the trier of fact unless the opinion is so unreasonable as to be unacceptable to a rational mind." *National Folding Box Co.* v. *New Haven*, 146 Conn. 578, 586, 153 A.2d 420 (1959); see also *Mather* v. *Griffin Hospital*, 207 Conn. 125, 145, 540 A.2d 666 (1988).

In the present case, the jury reasonably could have credited testimony that the two terms represent distinct medical conditions and disregarded the plaintiff's experts. Both surgeons, Mintz and Girasole, testified that an unstable spine represents an acute condition such as a patient with a destructive lesion or traumatic injury, and that a spine with instability represents a chronic, less serious condition, in which the spine is fundamentally stable. Robert Sarno, the defendants' radiology expert, viewed the plaintiff's radiological films and concluded that the plaintiff "did not have an unstable spine." In addition, both Andrews and Rotondi testified that they believed the plaintiff's spine was stable prior to intubation. Moreover, the jury reasonably could have inferred from the testimony of several of the plaintiff's experts that the plaintiff's spine was not unstable. Kaye testified that, as of July, 2001, the plaintiff was engaging in vigorous activity including swimming. Likewise, Heller testified that if a patient is myelopathic, it is mandatory to perform fiber-optic intubation, but he later admitted that the plaintiff did not have myelopathy. Because no party disputed that an unstable spine required fiber-optic intubation, the *only* way to construe the evidence in light of sustaining the jury's finding that the defendants did not breach the

standard of care is to conclude that the jury found a distinction between unstable and instability. We conclude, on the basis of the foregoing, that the jury reasonably could have found that the plaintiff did not have an unstable spine. Accordingly, the trial court properly admitted evidence supporting the use of standard endotracheal intubation at St. Vincent's.

## II

We next address the plaintiff's claim that the trial court abused its discretion by permitting the defendants' counsel to ask a prejudicial and confusing hypothetical question that misled the jury. The plaintiff principally argues that the hypothetical question was improper because the question incorporated: (1) facts that were not known to the defendants at the time of intubation; and (2) irrelevant evidence regarding the local standard of care at St. Vincent's. We conclude that because the hypothetical question was proper, the trial court did not abuse its discretion.

The following additional facts and procedural history are necessary for our resolution of this claim. During trial, defense counsel elicited expert testimony from Griswold via a long and complex hypothetical question. As we discussed previously, the hypothetical sought to elicit Griswold's opinion as to whether the defendants had complied with the applicable standard of care. The question itself contained a series of assumptions. The assumptions reasonably can be divided into two categories—assumptions that relate to the standard of care practiced at St. Vincent's, and assumptions about the plaintiff's medical condition. The assumptions with respect to the plaintiff's medical condition shared the commonality that they all tended to support the contention that the plaintiff did not have an unstable spine. For example, the hypothetical referenced medical reports, examinations and trial testimony indicating

that the plaintiff's spine was not unstable. Although each fact contained in the hypothetical was admitted into evidence at trial, it was undisputed that the information contained in the medical reports, examinations and trial testimony were unknown to the defendants at the time of intubation. Based on our reasoning in part I of this opinion, however, it is evident that the jury reasonably could have found, and likely did find, that each such assumption was a fact that *actually existed* at the time of intubation, but which was not personally known to the defendants.

The plaintiff twice objected to the hypothetical question. In his first objection, the plaintiff asserted that "[t]his isn't a hypothetical anymore. He's leading the witness through the entire thing." The trial court overruled the objection on the ground that the assumptions were trial testimony that could not be refuted. In his subsequent colloquy with the court, the plaintiff conceded that he had "no problem with the trial testimony." The plaintiff's second objection was to the form of the question. The trial court also overruled that objection. In the plaintiff's postverdict motion to set aside the verdict and for a new trial, however, the plaintiff argued that the hypothetical was improper principally because it incorporated facts not known to the defendants at the time of intubation. In this appeal, the plaintiff renews that claim and adds a claim that the question was improper because it contained irrelevant evidence concerning the standard of care at St. Vincent's.

As a threshold matter, we set forth our standard of review. The determination of the admissibility of a hypothetical question "calls for the exercise of a sound discretion as to whether the question, even though it does not contain all of the facts in evidence, presents the facts in such a manner that they [1] bear a true and fair relationship to each other and to the whole evidence in the case . . . [2] is not so worded as to be likely to

mislead or confuse the jury, and [3] is not so lacking in the essential facts as to be without value in the decision of the case." (Internal quotation marks omitted.) *Shelnitz* v. *Greenberg*, 200 Conn. 58, 77, 509 A.2d 1023 (1986); Conn. Code Evid. § 7-4 (c). We therefore review such questions under the abuse of discretion standard.

The plaintiff's first contention is that the hypothetical question was improper because it incorporated facts that were not known to the defendants at the time of intubation, even though the jury reasonably could have found that such facts existed in actuality, i.e., that the plaintiff's spine was not unstable. In support of this argument, the plaintiff cites our decision in *Tomer* v. *American Home Products Corp.*, 170 Conn. 681, 687, 368 A.2d 35 (1976), for the proposition that determining whether a defendant has breached the standard of care cannot be proven with hindsight evidence. Essentially, *Tomer* holds that if the scientific knowledge at the time of the alleged breach established that "medicine X" was safe for children, then a later discovery that "medicine X" was indeed not safe for children would be inadmissible to show that a physician had breached the standard of care. See id. Although we agree with the underlying proposition in *Tomer*, we conclude that *Tomer* does not support the plaintiff's argument in the present case.

In this case, the facts assumed in the hypothetical bore a true and fair relationship to each other and to the facts that the defendants believed at the time of intubation. Andrews testified that, at the time of intubation, he believed the plaintiff "didn't have an unstable spine." Similarly, the facts assumed in the hypothetical also tended to show that the plaintiff did not have an unstable spine prior to intubation. In light of this conformity, the hypothetical did not require the expert to evaluate the defendants' conduct in hindsight. At its worst, the assumed facts were cumulative of the defen-

dants' own belief that the spine was not unstable at the time of intubation. In short, each assumption was based on a fact in evidence that the jury reasonably could have found, and likely did find, credible within the scope of the defendants' knowledge at the time of intubation. Such assumptions do not lack a true and fair relationship to each other, nor would they likely confuse and mislead the jury. In ruling on the admissibility of expert testimony, "[t]he trial court has wide discretion . . . and, unless that discretion has been abused or the ruling involves a clear misconception of the law, the trial court's decision will not be disturbed." (Internal quotation marks omitted.) *Viera* v. *Cohen*, 283 Conn. 412, 444, 927 A.2d 843 (2007). We conclude that the trial court did not abuse its discretion by permitting the hypothetical question in this case.

As we discussed in part I of this opinion, the flaw in the plaintiff's argument is that it presupposes that the terms instability and unstable represent the same medical condition. The plaintiff contends, therefore, that because Andrews knew that the plaintiff's spine had instability, Andrews also knew the plaintiff's spine was unstable. In the plaintiff's scenario, the assumption in the hypothetical that the plaintiff's spine was *stable* would have been hindsight evidence because such evidence would have been in contrast to Andrews' belief at the relevant time. Andrews, however, testified that he interpreted instability, as that term was used by Mintz and Girasole, to mean that the spine was basically stable. Accordingly, as discussed, the assumption in the hypothetical that the plaintiff's spine was *stable* comported with Andrews' belief at the relevant time.

With respect to the plaintiff's other claim, raised for the first time in this court, that the question was improper because it was based, in part, on irrelevant evidence regarding the standard of care at St. Vincent's, we conclude that the plaintiff did not preserve this

evidentiary claim for our review. "Appellate review of evidentiary rulings is ordinarily limited to the specific legal [ground] raised by the objection of trial counsel. . . . To permit a party to raise a different ground on appeal than [that] raised during trial would amount to trial by ambuscade, unfair both to the trial court and to the opposing party." (Internal quotation marks omitted.) *State* v. *Stenner*, 281 Conn. 742, 755, 917 A.2d 28, cert. denied, 552 U.S. 883, 128 S. Ct. 290, 169 L. Ed. 2d 139 (2007); see *Skrzypiec* v. *Noonan*, 228 Conn. 1, 22 n.13, 633 A.2d 716 (1993) (declining to address appellate claim that testimony was prejudicial when objection at trial was based on relevance); see also Practice Book § 60-5. The plaintiff failed to raise this particular claim either in his objection at trial or in his postverdict motion. Accordingly, it is unpreserved, and we decline to review it.

## III

We next address the plaintiff's claim seeking a new trial because of various alleged improprieties committed by defense counsel during trial. The plaintiff contends that a new trial is required because, among other actions, the defendants' counsel: (1) utilized an operating room schedule (schedule) that counsel promised not to rely on during trial; and (2) improperly referred during summation to his emotional attachment to Andrews,[16] falsely accused the plaintiff of having changed his claims against the defendants, and, at one point, cried in front of the jury.

The following additional facts and procedural history are necessary for our resolution of this claim. The record reveals the following undisputed facts. The schedule contains a redacted list of various patients and the corresponding surgeries that were to be performed,

---

[16] Defense counsel stated that the action was "against a local doctor, who I obviously care about and . . . think was unjustly accused in this case."

including the plaintiff's, on the same day as the plaintiff's surgery. For an unspecified reason, St. Vincent's did not include the schedule within the documents subpoenaed by the plaintiff. During trial, the plaintiff suspected that the defendants possessed an additional document that had not been included in the St. Vincent's disclosure. When defense counsel admitted that the defendants possessed the schedule, the trial court ordered them to release a copy of the schedule to the plaintiff. The defendants complied. At the time, defense counsel told the court and the plaintiff that he would neither use, nor have any expert rely on, the schedule during trial. The court, however, did not issue an order prohibiting the use of the schedule. Contrary to defense counsel's representation, however, he sought to elicit testimony from Mintz using the schedule. The plaintiff objected, but defense counsel withdrew the question before the trial court's ruling. Later, defense counsel did use the schedule in his direct examination of Andrews without objection. Defense counsel again referred to the schedule in his closing argument, but the plaintiff did not object. With respect to the other allegations of impropriety during defense counsel's summation, the plaintiff also did not object. It is important to note, however, that the trial court interrupted defense counsel's closing argument, and, at sidebar, instructed defense counsel to "stop it right now" after he displayed visible emotion in front of the jury.[17] Subsequent to trial, the plaintiff raised the issues of the schedule and the summation improprieties in his postverdict motion to set aside the verdict and for new trial. The trial court denied the motion. The plaintiff renews both claims here.

---

[17] The parties dispute the level of emotion displayed by defense counsel. The plaintiff contends that defense counsel actually cried in front of the jury, whereas, defense counsel contends that he only had a "fleeting moment [of] emotion."

To the extent that the claims were unpreserved, the plaintiff invites us to review the claims under our inherent supervisory authority, the plain error doctrine, or *Golding*.[18] We decline to do so. "The plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice." (Internal quotation marks omitted.) *State* v. *Lawrence*, 282 Conn. 141, 183, 920 A.2d 236 (2007); see also Practice Book § 60-5. With respect to *Golding* review, a party "can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the [party] of a fair trial; and (4) if subject to harmless error analysis, the [opposing party] has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Additionally, "[i]n certain instances, dictated by the interests of justice, we may, sua sponte, exercise our inherent supervisory power to review an unpreserved claim that has not been raised appropriately under the *Golding* or plain error doctrines." *State* v. *Ramos*, 261 Conn. 156, 172 n.16, 801 A.2d 788 (2002). "[O]ur supervisory powers are invoked only in the rare circumstance where [the] traditional protections are inadequate to ensure the fair and just administration of the courts . . . ." (Internal quotation marks omitted.) *State* v. *Anderson*, 255 Conn. 425, 439, 773 A.2d 287 (2001).

[18] The plaintiff concedes that the issues raised here were not adequately preserved for review.

Instead, "[w]e repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . Where a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 266 Conn. 108, 120, 830 A.2d 1121 (2003). While the plaintiff's brief on this issue consists of five pages of argument, we do not find the number of pages related to a particular argument to be dispositive. With respect to the schedule, the plaintiff's brief consists of three pages of facts and *no* citation to any legal authority. We consider that claim to be abandoned. With respect to the alleged improprieties of defense counsel during summation, the plaintiff's brief is devoid of legal analysis regarding *any* of the *Golding* prongs or plain error review. In fact, the only discussion of *Golding* or plain error review in the plaintiff's brief consists of a lone citation, in a footnote, to *Golding* and to "the plain error doctrine." In addition, none of the cases that the plaintiff cites relate to either *Golding* review or plain error review. Having concluded that the plaintiff failed to brief adequately the issue of the alleged improprieties by defense counsel with respect to *Golding* and plain error review, we also conclude that the interests of justice do not require that we review this claim under our inherent supervisory authority.[19] *State* v. *Ramos*, supra, 261 Conn. 172 n.16.[20]

[19] Although the plaintiff's brief with respect to our inherent supervisory authority also nears inadequacy, we observe that the plaintiff did cite one legal authority that actually applied that standard.

[20] Although we do not condone actions or comments by counsel that go beyond the bounds of forceful advocacy, the trial court in this case responded swiftly to terminate the improper conduct. In addition, the trial court prop-

## IV

The plaintiff's final claim is that the trial court improperly awarded the defendants various trial costs.[21] We set forth our standard of review. The question of whether trial costs are taxable is a question of law over which our review is plenary. See *Traystman, Coric & Keramidas, P.C.* v. *Daigle*, 282 Conn. 418, 428–29, 922 A.2d 1056 (2007). Furthermore, "[t]he law expects parties to bear their own litigation expenses, except where the legislature has dictated otherwise by way of statute." (Internal quotation marks omitted.) Id., 429; *Verrastro* v. *Sivertsen*, 188 Conn. 213, 217, 448 A.2d 1344 (1982). Because "[c]osts are the creature of statute . . . unless the statute clearly provides for them courts cannot tax them." (Internal quotation marks omitted.) *M. DeMatteo Construction Co.* v. *New London*, 236 Conn. 710, 715, 674 A.2d 845 (1996). Accordingly, the defendants can prevail only if the statutory provisions on which they rely "clearly empower" the trial court to tax the costs to the plaintiff. Id., 716.

At the outset, we address the defendants' argument that General Statutes § 52-195 authorizes the costs.[22] Section 52-195 (b) provides in relevant part that "[u]nless the plaintiff recovers more than the sum specified in the offer of compromise[23] . . . the plaintiff . . . shall pay the defendant's costs . . . ." "When constru-

erly charged the jury that the arguments of counsel do not constitute evidence and that sympathy is not to play a role in its verdict.

[21] Although the trial court awarded costs in addition to those discussed in part IV of this opinion, the plaintiff does not challenge those costs on appeal, and our decision does not affect those costs.

[22] The defendants' reliance on § 52-195 is grounded on the plaintiff's rejection of Andrews' offer of judgment for $100,000, and the plaintiff's failure to recover more than the sum specified in the offer of judgment.

[23] When § 52-195 (b) was amended by No. 05-275, § 7, of the 2005 Public Acts, the phrase "offer of judgment" was replaced by the phrase "offer of compromise . . . ." For convenience, we refer to the current version of the statute.

ing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Windels* v. *Environmental Protection Commission*, 284 Conn. 268, 294–95, 933 A.2d 256 (2007).

In the present case, it is clear that, standing alone, § 52-195 (b) does not authorize the recovery of the defendants' costs. Aside from the explicit authorization to recover attorney's fees not to exceed $350, § 52-195 (b) itself is not a basis for taxing any other particular cost, and the term "costs" is not further defined by the statute. In *Traystman, Coric & Keramidas, P.C.* v. *Daigle*, supra, 282 Conn. 434, we observed that Practice Book § 17-13 does not permit recovery for costs not otherwise authorized by statute.[24] See also *Arnone* v.

---

[24] Practice Book § 17-13 provides: "If the plaintiff does not, within the time allowed for acceptance of the offer of compromise and before any evidence is offered at the trial, file the plaintiff's notice of acceptance, the offer shall be deemed to be withdrawn and shall not be given in evidence; and the plaintiff, unless recovering more than the sum specified in the offer, with interest from its date, shall recover no costs accruing after the plaintiff received notice of the filing of such offer, but shall pay the defendant's

*Enfield,* 79 Conn. App. 501, 531–34, 831 A.2d 260 (rejecting claim for expert witness fees under General Statutes § 31-51m because statute did not define "'costs'" or expressly allow such fees and because trial court required to award costs in accordance with General Statutes §§ 52-257 and 52-260), cert. denied, 266 Conn. 932, 837 A.2d 804 (2003). We believe it is appropriate to construe Practice Book § 17-3 and § 52-195 in pari materia. Accordingly, § 52-195 requires a plaintiff to pay costs that are *authorized elsewhere in the statutes* if the plaintiff fails to recover more than the offer of compromise. Therefore, the defendants must rely on additional statutory bases to support the taxing of costs to the plaintiff. We address each item of costs awarded by the trial court in turn.

A

The trial court awarded $7785.46 for the expense of daily expedited trial transcripts. Because no statute expressly authorizes these costs, we conclude that the transcript costs may not be recovered. In *Traystman, Coric & Keramidas, P.C.* v. *Daigle,* supra, 282 Conn. 433–34, we addressed the issue of whether the trial court could tax trial transcript costs to a plaintiff. In that case, we observed that "[n]either the defendant nor the trial court . . . has identified any statute authorizing [trial transcript] costs or provided any authority for the proposition that the costs referred to in [Practice Book] § 17-13 [the offer of judgment section] may include costs not otherwise authorized by statute." Id., 434. Similarly, in this case, because neither

costs accruing after said time. Such costs may include reasonable attorney's fees in an amount not to exceed $350. Nothing in this section shall be interpreted to abrogate the contractual rights of any party concerning the recovery of attorney's fees in accordance with the provisions of any written contract between the parties to the action. The provisions of this section shall not apply to cases in which nominal damages have been assessed upon a hearing after a default or after a motion to strike has been denied."

the defendants nor the trial court has identified a statutory authority for taxing trial transcript costs, the trial court improperly awarded these costs.

## B

The trial court awarded $1632.50 for expenses incurred when the defendants' attorney attended a deposition of Heller via videoconference. Because no statute expressly authorizes this cost, the defendants argue that § 52-257 (b) (12) substantiates the trial court's award because it "contemplates" video. This reliance is misplaced. Section 52-257 (b) (12) permits recovery "for the recording, videotaping, transcribing and presentation of the deposition of a practitioner of the healing arts . . . that is used in lieu of live testimony in the civil action . . . ." The plain meaning is clear. The text authorizes recovery only for the costs of videotaping a deposition used in lieu of live testimony. The defendants' argument fails for two reasons. First, the deposition was not used in lieu of live testimony. The deponent, Heller, testified at trial. Second, there is no authority to support the contention that the subsection's use of the prefix "video" is meant to permit recovery for any expense, other than that specifically referenced, which also happens to include the prefix "video."

## C

The trial court awarded $16,500 for the expense of having the defendants and their employees testify at trial.[25] No statute expressly authorizes the taxing of this cost. The defendants cite § 52-257 (b) (1) for the proposition that a plaintiff may be taxed for the expense of a defendant's own testimony at trial. We disagree.

[25] The breakdown was as follows: Andrews, $7000; Bladek, $3500; William Gasco, an anesthesiologist, $3500; Rotondi, $1500; and Barbara Pellegrino, a nurse, $1000. At all times relevant to the present action, each witness was either named as a defendant or an employee of Medical Anesthesiology.

Section 52-257 (b) (1) permits a party to recover "[f]or each witness attending court, the witness' legal fee and mileage . . . ." Section 52-260 (f), more specifically refers to witness fees for any practitioner of the healing arts, which includes physicians and registered nurses.[26] See *Ludington* v. *Sayers*, 64 Conn. App. 768, 780–81, 778 A.2d 262 (2001) (observing that § 52-260 [f] should be interpreted with regard to subsections [a] and [b] of § 52-257 because legislature is presumed to have created consistent body of law). While the statutes do not define the term "witness," the defendants do not cite any authority indicating that the legislature intended the term, as used in § 52-257 or § 52-260, to include fees for a plaintiff or a defendant testifying in his or her own case. In fact, such a construction runs counter to the American rule whereby "ordinary expenses and burdens of litigation are not allowed to the successful party absent a contractual or statutory exception." (Internal quotation marks omitted.) *ACMAT Corp.* v. *Greater New York Mutual Ins. Co.*, 282 Conn. 576, 582, 923 A.2d 697 (2007). It is difficult to conceive why a plaintiff or a defendant, both of whom are often present during trial, should be compensated for time spent sitting in the witness chair as opposed to time spent sitting at counsel table. Absent express statutory language to the contrary, we will not read such a construction into the text.

---

[26] General Statutes § 52-260 (f) provides: "When any practitioner of the healing arts, as defined in section 20-1, dentist, registered nurse, advanced practice registered nurse or licensed practical nurse, as defined in section 20-87a, psychologist or real estate appraiser gives expert testimony in any action or proceeding, including by means of a deposition, the court shall determine a reasonable fee to be paid to such practitioner of the healing arts, dentist, registered nurse, advanced practice registered nurse, licensed practical nurse, psychologist or real estate appraiser and taxed as part of the costs in lieu of all other witness fees payable to such practitioner of the healing arts, dentist, registered nurse, advanced practice registered nurse, licensed practical nurse, psychologist or real estate appraiser."

D

The plaintiff contests the trial court's award of the following costs for the defense experts' nontestimonial work: (1) $7700 for trial preparation time; (2) $3500 for travel expenses; and (3) $817.41 for transportation and hotel expenses. Because no statute expressly authorizes these costs, we agree with the plaintiff that they were improper.

The question of whether costs for the trial preparation time of a defendants' experts can be taxed to a plaintiff who did not recover more than the offer of judgment is one of first impression. In *Levesque* v. *Bristol Hospital, Inc.*, 286 Conn. 234, 262, 943 A.2d 430 (2008), we observed that "[i]n [*M. DeMatteo Construction Co.* v. *New London,* supra, 236 Conn. 710] . . . we did not decide whether the trial court had the statutory authority to award costs to [the plaintiff] for the fee that it had incurred for its appraiser's trial *preparation* time." (Emphasis added.) In the present case, both parties argue that § 52-260 (f) is the relevant statute. We agree.

At the outset, we observe that there is a split of authority among trial courts on the interpretation of § 52-260 (f) as it relates to an expert's trial preparation time. Compare, e.g., *Bonomo* v. *Kovacs,* Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. CV-04-4001273-S (November 19, 2007) (44 Conn. L. Rptr. 492) (concluding that § 52-260 [f] authorizes award of costs for expert's trial preparation time); with *Leone* v. *Ciaburri,* Superior Court, judicial district of Fairfield at Bridgeport, Docket No. CV-02-0389926-S (April 19, 2007) (43 Conn. L. Rptr. 273) (concluding that § 52-260 [f] does not authorize award of costs for expert's trial preparation time).

We first look to the text of § 52-260 (f) to determine whether the text itself and its relationship to other

statutes reveals a clear and unambiguous meaning. The relevant portion of § 52-260 (f) provides: "When any practitioner of the healing arts . . . gives expert testimony in any action or proceeding, including by means of a deposition, the court shall determine a reasonable fee to be paid to such practitioner of the healing arts . . . and taxed as part of the costs in lieu of all other witness fees payable to such practitioner of the healing arts . . . ." It is clear that the language of § 52-260 (f) neither authorizes a reasonable fee for an expert's trial preparation time as distinguished from his or her in-court trial testimony, nor expressly authorizes costs for an expert's travel, transportation and hotel costs. Thus, as we noted in *M. DeMatteo Construction Co.* v. *New London,* supra, 236 Conn. 717, "[b]y its express terms, § 52-260 (f) treats as taxable only those costs that arise from an expert's testimony at trial." Accordingly, absent such an express legislative provision, we find no reason to abrogate this state's long-standing adherence to the American rule that litigants are responsible for the payment of their own litigation expenses.

Our recent decision in *Levesque* v. *Bristol Hospital, Inc.,* supra, 286 Conn. 234, does not control our conclusion in the present action. In that case, we concluded that the plain terms of Practice Book § 13-4 (3) authorized the award of costs associated with the time spent by an expert in preparation for his or her deposition.[27] Id., 263. We relied on a federal District Court's interpre-

---

[27] Practice Book § 13-4 (3) provides: "Unless manifest injustice would result, (A) the judicial authority shall require that the party seeking discovery pay the expert a reasonable fee *for time spent in responding to discovery* under subdivisions (1) (B) and (2) of this rule; and (B) with respect to discovery obtained under subdivision (1) (B) of this rule the judicial authority may require, and with respect to discovery obtained under subdivision (2) of this rule the judicial authority shall require, the party seeking discovery to pay the other party a fair portion of the fees and expenses reasonably incurred by the latter party in obtaining facts and opinions from the expert." (Emphasis added.)

tation of rule 26 (b) (4) (C) of the Federal Rules of Civil Procedure, which is identical to § 13-4 (3) of the Connecticut rules of practice, to conclude that " '[t]ime spent preparing for a deposition is, literally speaking, time spent in responding to discovery . . . .' *Collins* v. *Woodridge*, 197 F.R.D. 354, 357 (N.D. Ill. 1999)." *Levesque* v. *Bristol Hospital, Inc.*, supra, 259. Furthermore, we saw "no reason why the broad language of § 52-260 (f) should be narrowly construed to conflict with the clear import of Practice Book § 13-4 (3)." Id., 263. In the present action, however, there is no applicable provision within the rules of practice to authorize the cost expressly, nor is there a corollary federal rule to support a different interpretation of § 52-260 (f) than the one derived from its plain meaning. Accordingly, we conclude that the trial court improperly awarded costs for nontestimonial work performed by the defendants' expert witnesses.

The judgment is reversed as to the award of certain costs only and the case is remanded with direction to render judgment as on file except as modified to eliminate the award of costs in accordance with this opinion. The opinion is affirmed in all other respects.

In this opinion the other justices concurred.